STANDARD LINEN SERVICE, INC., ET AL.,[1] PETITIONERS, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 67447, 69229–69237.   Filed October 8, 1959.

[1] Proceedings of the following petitioners are consolidated herewith : The Model Laundry *Company*, Transferee, Docket No. 69229 ; The Model Laundry Company, Docket No. 69230 ; Trust No. 1, Created by Dolph Harteveld for the Benefit of Bette Harteveld Gillman and Roslyn Harteveld Stern, Lillian Harteveld, Henry A. Marks and Bette Harteveld Gillman, Trustees, Docket No. 69231 ; Dolph Harteveld and Lillian M. Harteveld, Docket No. 69232 ; Henry A. Marks and Hermina M. Marks, Docket No. 69233 ; Bernard D. Gillman and Bette H. Gillman, Docket No. 69234 ; Melvin B. Stern and Roslyn H. Stern, Docket No. 69235 ; Stanley A. Marks, Docket No. 69236 ; Trust No. 1, Created by Henry A. Marks for the Benefit of Stanley A. Marks, Dolph Harteveld, Hermina M. Marks, and Stanley A. Marks, Trustees, Docket No. 69237.

1

*E. Chas. Eichenbaum, Esq.*, and *Leonard L. Scott, Esq.*, for the petitioners.

*David M. Robinson, Esq.*, and *Donald P. Krainess, Esq.*, for the respondent.

TIETJENS, *Judge:* These consolidated proceedings involve deficiencies in income tax for the year 1953 in the amounts set forth below:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 67447 | Standard Linen Service, Inc | $2,460.00 |
| 69229 | The Model Laundry Co., Transferee | 2,460.00 |
| 69230 | The Model Laundry Co | 308,529.39 |
| 69231 | Dolph Harteveld Trust No. 1, et al | 11,992.45 |
| 69232 | Dolph and Lillian M. Harteveld | 223,908.09 |
| 69233 | Henry A. and Hermina M. Marks | 515,270.13 |
| 69234 | Bernard D. and Bette H. Gillman | 85,350.91 |
| 69235 | Melvin B. and Roslyn H. Stern | 87,027.51 |
| 69236 | Stanley A. Marks | 411,933.02 |
| 69237 | Henry A. Marks Trust No. 1, et al | 2,713.79 |

The issues for decision are: (1) Whether the transfer by the Model Laundry Company of its linen supply assets to the American Linen Supply Company of Chicago (Alsco) in exchange for 45,476 shares of Model stock constituted a partial liquidation with no gain recognized to Model, or a sale of assets with the attendant gain chargeable to Model; in the event the transaction is held to be a sale of assets (2) what was Model's basis for those assets; (3) what basis did the individual petitioners have in the 45,476 shares of Model's stock which were transferred by them to Alsco; (4) whether the transfer by

Henry A. Marks of 2,202 shares of Model's stock to his son, in exchange for the latter's promissory note, which stock was included in the transfer from the individual petitioners to Alsco and the subsequent transfer from Alsco to Model, resulted in a dividend taxable to Henry under section 115(g)(1) of the 1939 Code to the extent of the sale's price of that stock; (5) whether Model incurred ordinary and necessary business expenses with respect to the transfer of its assets to Alsco which were deductible under section 23(a) of the 1939 Code; (6) whether legal fees paid by Standard Linen, Inc., were deductible as ordinary and necessary business expenses; (6) whether the demolition of buildings owned by Henry A. Marks and Dolph Harteveld resulted in a deductible loss; and (7) whether a bad debt claimed by Dolph and Lillian M. Harteveld was a business or a nonbusiness bad debt.

### FINDINGS OF FACT.

At all times material hereto, petitioners, the Model Laundry Company and Standard Linen Service, Inc., Ohio corporations, had their principal place of business in Cincinnati, Ohio; Henry A. and Hermina Marks, husband and wife, their son, Stanley A. Marks, Dolph and Lillian M. Harteveld, husband and wife, Bernard D. and Bette H. Gillman, husband and wife, Melvin B. and Roslyn H. Stern, husband and wife; and the trustees of Trust No. 1 for the Benefit of Stanley A. Marks, and of Trust No. 1 for the Benefit of Bette Harteveld Gillman and Roslyn Harteveld Stern, resided in Cincinnati, Ohio. All petitioners filed their Federal income tax returns for the year in issue with the director of internal revenue at Cincinnati, Ohio.

In 1951, the Model Laundry Company (hereinafter referred to as Model) was engaged in the laundry and linen supply business in Cincinnati, Ohio. Standard Linen Service, Inc. (hereinafter referred to as Standard), was a wholly owned subsidiary of Model. In either May or June of 1951, Henry A. Marks learned that Model's controlling shareholders were interested in selling their stock in the company, preferably to Cincinnati investors. Henry was interested in purchasing control of Model, and discussed the acquisition with his wife, Hermina, and their son, Stanley. However, the sum they wished to invest was insufficient to acquire all of the shares that might be offered. Accordingly, they embarked on a program to interest other investors in a purchase of Model's stock.

On September 25, 1951, there was executed an agreement relative to the purchase of not less than 51 per cent of Model's stock at $18 per share plus a commission of 50 cents per share, between Henry and Stanley Marks as principal and agent for others, parties of the first part, and Sidney Meyers, Philip Meyers, Melville Meyers, Dolph

Harteveld, and Sidney Weil, as principal and agent for others, parties of the second part. This agreement recited that Henry had requested the parties of the second part to participate in the purchase of Model's stock; that in accordance therewith they agreed to deposit with him the sum of $600,000, which he then agreed to deposit in escrow for the purchase of such stock; that in consideration for the agreement of the parties of the second part, Henry agreed to repurchase the stock from them at the end of 5 years for $23.50 a share; that the first 33,333⅓ shares were to go to the parties of the first part, that the second 33,-333⅓ shares were to go to the parties of the second part, and any additional shares would be purchased by the parties on a pro rata basis; that each party was to have equal representation on the board of directors; and that Henry was to serve as president and general manager at a salary of $25,000 per year.

On September 28, 1951, Henry entered into an agreement with the principal Model shareholders to purchase at least 51 per cent of the outstanding capital stock of the company, which at that time was represented by 92,105 shares of common stock. Under the terms of that agreement, Henry and those he represented acquired by purchase 77,807 shares of Model's stock as set forth below:

| Name | Shares | Name | Shares |
|---|---|---|---|
| Henry A. Marks | 14,500 | Philip Meyers | 6,600 |
| Hermina M. Marks | 12,400 | Sidney Weil | 1,100 |
| Stanley A. Marks | 11,307 | Irwin Weil | 145 |
| Dolph Harteveld | 4,950 | Florence L. Weil | 1,230 |
| Lillian M. Harteveld | 5,600 | Gordon Weil | 925 |
| Roslyn H. Stern | 1,350 | Cecille S. Weil | 925 |
| Bernard D. Gillman | 500 | Walter H. Lewis | 1,000 |
| Bette H. Gillman | 800 | Samuel Samson | 1,000 |
| Sidney Meyers | 6,600 | Victor S. Greenebaum | 275 |
| Melville Meyers | 6,600 | | |

Of the 11,307 shares attributed to Stanley A. Marks, 10,457 were purchased by Stanley individually, and 850 were purchased by a trust created for his benefit. Of the 4,950 shares purchased by Dolph Harteveld, 3,700 shares belonged to him individually and 1,250 shares belonged to the Lillian Harteveld Trust No. 1 for the benefit of Bette Gillman and Roslyn Stern. These 1,250 shares were distributed equally to the trust beneficiaries on its termination in September 1953. Of the 5,600 purchased by Lillian Harteveld, 3,250 belonged to her individually, and 2,350 were held by her as a trustee of the Dolph Harteveld Trust No. 1.

After the purchase, Henry A. Marks became Model's president, and took an active part in the operation of the company. Henry A. Marks, Hermina M. Marks, Stanley A. Marks, Dolph Harteveld, and Oscar Frank were elected directors of the company.

Model had 6 operating plants, 2 warehouses, and a general office. It owned 5 of its plants, and leased the sixth through Standard under a lease which was due to expire about the close of 1953. It conducted its linen supply operations under the name of the American Linen Supply Company, which operated at a company owned plant located on Reading Road, as well as through Standard, which operated the leased plant on Mercer Street. Its laundry business, consisting of some 70 routes involving some 25,000 customers weekly, was conducted separately from its linen supply business.

In August of 1953, the Meyers and Weil group wished to sell their Model stock in order to acquire cash with which to finance a proposed real estate purchase. On Henry A. Marks's recommendation it was decided that the company would acquire the shares, and in accordance therewith Model purchased 26,400 of its stock from the liquidating group at $23.50 per share for a total consideration of $620,400. As a result, Model's working capital was greatly reduced, and it became necessary to finance part of the acquisition through short-term bank loans.

In the latter part of 1953 Model was faced with the necessity of expending some $150,000 to bring its equipment up to normal operating conditions. It had heavy liabilities, represented by short-term loans in the amount of $575,000, the terms of which prevented further borrowings. It became necessary to reduce the annual dividend. Standard's lease on the Mercer Street property was expiring, and it would either have to purchase and repair a rundown building or move to a new location. In addition, there was concern that Model might become involved in the numerous restraint of trade indictments being returned about that time against various linen supply companies. Further, Model was faced with serious labor problems. There was also under consideration a suggestion that Model enlarge its dry-cleaning business, which was then being operated on a restricted scale.

Confronted by these circumstances, Dolph Harteveld and Stanley Marks decided to sell their Model stock. Stanley advised his mother that she also should sell her Model stock. While Henry Marks was more optimistic than the other shareholders, in that he thought the problems could be worked out, rather than cause dissension he contacted the American Linen Supply Company of Chicago (hereinafter referred to as Alsco) relative to a possible purchase of Model's stock.

Throughout the negotiations with Alsco, Henry and his son Stanley represented the prospective selling shareholders, composed primarily of the Marks, Harteveld, Gillman, and Stern group. From the outset, Alsco was interested in acquiring only the linen supply assets of Model and Standard. It had no interest in Model's laundry business, and did not wish to become involved in any stock purchase

arrangement or liquidating arrangement. On the other hand, the prospective sellers offered only their stock for sale, motivated in part by consideration of the tax problems involved in any other type of transaction. At a preliminary conference on October 16, 1953, various means of effectuating the desires of both sellers and purchasers were explored.

In a letter to Henry Marks, dated November 2, 1953, Alsco's attitude with respect to any proposed sale was expressed as set forth below:

Once again we must start out by reiterating our inability to purchase your stock in the present corporation as such. The reasons are much the same as before. Without going into elaborate detailed reasons, I think it is fair to make the open statement that the net effect of your counter offer was for you to realize certain proceeds of sale, together with the opportunity to buy certain laundry and/or drycleaning assets free and clear of any or all liens and encumbrances. Furthermore, we would have the duty of dealing with minority shareholders and the cost of any liquidation to be entered into. What this boils down to is the exact reverse of our original offer; namely, that we acquire free and clear of any liens or encumbrances specific assets pertaining to the linen supply business that we are interested in for our $2,000,000.00. You will be the first to appreciate that our offer contemplated no deals on our part with any minority shareholders or with any liquidating processes.

We are still of that mind, but, at the same time, have not completely shut our minds to a middle road whereby we could jointly share certain burdens with you, provided the transactions are completely consummated not later than Christmas Day, 1953.

Negotiations proceeded, and on December 1, 1953, Alsco offered to purchase through Stanley, as representative of his group, 45,476 shares of Model's common stock at $42 per share, for an aggregate total purchase price of $1,909,992. The offer recited that the purchase price was based upon the fair market value of the net linen supply assets of Model and Standard and their subsidiary and affiliate companies.

The offer provided that Alsco was not obligated to complete the transaction, if, by closing:

Standard had not been liquidated and dissolved, and its net assets transferred to Model;

Model or Standard had taken any action authorizing the issuance of any shares or securities, excepting debentures in the face amount of $800,000 bearing interest at 4 per cent and maturing on or before December 31, 1968, or had declared either a stock or cash dividend on any of its outstanding shares;

Model had failed to take those actions necessary to permit Alsco to surrender to it in exchange for its linen supply assets the 45,476 shares of its stock contemplated to be purchased by Alsco;

Alsco was not furnished with all the instruments necessary to transfer effectively to it the linen supply assets of both Model and Standard;

Alsco had not been furnished with a legal opinion to the effect that Model could lawfully exchange the linen supply assets desired by Alsco to Alsco in exchange for the 45,476 shares of Model stock, and further approving the lawful effectiveness of the instruments purporting to transfer such assets free and clear of any encumbrances whatsoever;

There was pending any action to restrain Model from dissolving Standard, distributing its assets to itself, and then exchanging its linen supply assets to Alsco in exchange for the 45,476 shares of stock proposed to be purchased; or any action the effect of which would be to encumber the linen supply assets to be transferred in any manner whatsoever; and

The linen supply assets proposed to be transferred to Alsco had in any material way been damaged or destroyed by casualty.

It was further proposed, should Model authorize the issuance of debentures in any amount not to exceed $800,000 bearing 4 per cent interest per annum, maturing on December 31, 1968, and should the selling shareholders agree to accept as part of the purchase price $17 in those debentures for each share purchased, that Alsco would direct the First National Bank of Cincinnati to make available to Model an amount sufficient to purchase $773,092 face value of those debentures less the revenue stamps necessary to effectuate their transfer.

The offer further recited that Alsco would pay the $1,909,992 purchase price through an escrow established at the First National Bank of Cincinnati; 10 per cent upon closing; 10 per cent on December 24, 1953, and 80 per cent on January 5, 1954. The escrow arrangement contemplated deposit by the selling shareholders of 45,476 shares of Model's stock, deposit by Model of $773,092 face amount of its debentures in form suitable for distribution to the depositing shareholders at the rate of $17 per share; and Alsco's direction to the bank to make available to Model $773,092, less the amount of revenue stamps required to effectuate the transaction, and to disburse among the selling shareholders $25 cash plus $17 face value of Model debentures for each share purchased.

Model's shareholders were formally notified in a letter from a Cincinnati brokerage firm and a statement signed by Stanley A. Marks of the proposed transaction on December 5, 1953. They were further informed that acceptance of the offer would necessitate various procedural steps, among which were: The cancellation and retirement of Model's 59,872 shares of treasury stock in addition to the shares to

be surrendered by Alsco as part of the transaction; the refunding of Model's short-term indebtedness over a longer period; the dissolution of Standard and distribution of all its assets, subject to its debts, in kind to Model; partial liquidation of Model in exchange for the 45,476 shares of its stock proposed to be transferred to Alsco, with the distribution to Alsco of all Model's linen supply assets and its chair and table rental business; execution by Model of a covenant not to compete with Alsco in the linen supply business for a period of 5 years within a 100-mile radius of Cincinnati; and execution of a lease by Model to Alsco for a 5-year term of the Reading Road property with option to purchase at its termination.

On December 16, 1953, at a special meeting of stockholders, the various procedural steps were voted and approved. Thereafter, Standard's shareholders voted for a dissolution, which occurred on December 16, and its assets were transferred to its shareholder, Model.

Immediately prior to December 18, 1953, there was a deposit of 45,476 shares of Model's stock in escrow with the First National Bank of Cincinnati. In order to make up the required 45,476 shares, Stanley, in early December 1953, acquired 2,202 shares from his father at $42 per share, for which he gave his 60-day promissory note. This note was paid by Stanley from the proceeds of sale following the transaction of December 18, 1953.

On December 18, 1953, the following transactions took place at the First National Bank of Cincinnati, commencing at 4:05 p.m.:

1. Alsco paid Model $773,092 which was credited to Model's bank account, and one Model debenture bond in the face amount of $773,092 was passed to Alsco.

2. The debenture bond and a check for $200,000 was handed by Alsco to the escrow agent.

3. The escrow agent then delivered stock certificates for 45,476 shares of Model's stock to Alsco.

4. Alsco then delivered the stock certificates to Model, receiving in return the documents transferring title to Model's linen supply assets, a lease of real property, certain indemnity agreements and restrictive agreements, all of which had previously been bargained for.

5. Alsco's Chicago representative was informed that a transfer of assets had been made.

6. Alsco's Chicago representative executed a note to the Chicago bank in an amount equal to the cash balance of the $1,909,992 needed by Alsco to complete the transaction; the Chicago bank telegraphing that amount to the Cincinnati bank.

7. The money then arrived in Cincinnati, which completed the transaction.

On December 21, 1953, the escrow agent paid Alsco the sum of $3,578.97, which represented repayment of the advance made by Alsco for Federal documentary stamp taxes incurred in connection with the sale of the 45,476 shares of Model's stock and the issuance of $773,092 principal amount of debentures. Also on that day, the escrow agent paid Model the amount of $772,241.59, representing the purchase price for the debentures issued to Alsco less $850.41 Federal issue tax incurred on the transaction.

In due course, Model filed with the State of Ohio an amendment to its articles of incorporation evidencing its reduction of capital and partial liquidation.

On December 21, 1953, the selling shareholders received the first installment of cash from Alsco in the amount of $4.20 per share. The second installment, in the amount of $4.20 per share, was received on December 24, 1953. On January 5, 1954, the final installment of $16.54 per share was received. Additionally, each shareholder received $17 in Model debentures for each share of Model's stock sold. These debentures conferred no dividend or voting rights, and granted their holder no voice in the choice of directors.

The number of shares of Model stock held by its stockholders on December 5, 1953, the number of its shares sold by them to Alsco, and the number of shares retained by them as of December 28, 1953, were as set forth below:

| Stockholder | Shares held Dec. 5, 1953 | Shares sold | Shares held Dec. 28, 1953 |
|---|---|---|---|
| Henry A. Marks | 14,500 | [1] 2,202 | 12,298 |
| Hermina M. Marks | 12,400 | 12,400 | [3] |
| Stanley A. Marks | 10,457 | [2] 10,457 | [3] |
| Dolph Harteveld | 3,700 | 3,700 | [3] |
| Lillian M. Harteveld | 3,250 | 3,250 | [3] |
| Roslyn H. Stern | 1,975 | 1,975 | [3] |
| Bernard D. Gillman | 500 | 500 | [3] |
| Bette H. Gillman | 1,425 | 1,425 | [3] |
| Henry A. Marks Trust No. 1 for Benefit of Stanley A. Marks | 850 | 850 | [3] |
| Dolph Harteveld Trust No. 1 for Benefit of Bette H. Gillman and Roslyn H. Stern | 2,350 | 2,350 | [3] |
| Others | 10,388 | 6,367 | 4,021 |
| Total | 61,795 | 45,476 | 16,319 |

[1] These shares were sold by Henry to his son Stanley in early December, and resold by Stanley to Alsco as part of the December 18 transaction.

[2] Exclusive of the 2,202 shares acquired from Henry A. Marks.

[3] None.

Following the December 18 transaction, the 45,476 shares made the subject thereof were retired and canceled as well as 59,872 shares which had been held as treasury stock. Henry Marks continued to

serve as president and a director of Model, and Stanley served as a director for a period of a year and a half as an accommodation to his father.

Immediately prior to the exchanges of December 18, Model had a linen supply inventory of $221,000, and maintained linen equipment and trucks valued at $290,000. After the exchanges, these assets were no longer held by Model. The exchanges also resulted in a contraction of Model's business, in that it no longer engaged in its linen supply operation. Outstanding capital stock was reduced from 61,795 shares to 16,319 shares. Short-term loans of $555,000 outstanding prior to the exchanges were translated into long-term obligations of $773,000.

Model and Standard had a combined earned surplus of $1,139,330.56 as of January 1, 1953.

On their returns the individual petitioners reported the excess of the amounts received for their stock over their basis as long-term capital gains. Respondent determined the amounts received by the stockholders constituted a taxable dividend within the meaning of section 115(g)(1) of the Internal Revenue Code of 1939. In the alternative, he determined that the instant series of events constituted a reorganization of the Model Laundry Company within the meaning of section 112(g)(1)(E) governed by section 112(b)(3) and that the individual petitioners received a cash dividend of $25 per share taxable as ordinary income under section 112(c).

With respect to Model, respondent determined that the transactions constituted a sale of assets by Model to Alsco for a total sales price of $1,909,992. He further determined that expenses of the sale were $6,750, that the basis of the assets sold was $734,841,31, and that Model realized a taxable gain of $1,168,400.69.

Respondent disallowed a deduction in the amount of $9,125.41 claimed by Model with respect to the transfer of its assets to Alsco, amendment of its corporate charter, redemption and cancellation of its stock, and the issuance of its bonds. Included in this amount were the amounts of $1,500 and $850.41 representing a legal fee paid for the preparation and registration of Model's debenture bonds and the documentary stamp tax incurred on such issue, respectively. The remainder of the $9,125.41 deduction was comprised of miscellaneous expenses relating to the December 18 transaction which respondent used to reduce the alleged gain determined by him to be chargeable to Model as a result of the various transfers between the parties.

Respondent further disallowed a deduction in the amount of $3,000 claimed by Standard representing legal fees paid with respect to Standard's dissolution and liquidation.

In 1953, Henry A. Marks and Dolph Harteveld owned certain real property in Cincinnati upon which was located 2 buildings, a garage,

and a diner, all of which were leased for income-producing purposes. In July of that year, they entered into a contract to sell that property, pertinent provisions of which are set forth below:

Sellers agree, as soon as is reasonably possible after the signing of this Contract, to take the necessary steps to clear, remove or demolish from the above described premises all of the existing buildings, including a diner now situated thereon, and to permit Purchaser to enter in possession of unimproved property as soon as possible. * * *

Purchaser shall, as soon as is reasonably possible after it obtains possession, at its own expense and under its own supervision and plans improve the premises above described with a hard surface covering which can be used for a parking lot. These improvements in building a parking lot shall cost Purchaser no less than $5,000.00.

The buildings located on the property were old and in an advanced state of deterioration. For some 5 years or more prior to 1953 the City of Cincinnati had threatened to issue orders against the buildings, and within 6 months of the contract of sale had issued an order requiring that the buildings be ratproofed, which would have required an estimated expenditure of $700,000 to $800,000. Marks and Harteveld then decided to raze the existing structures. This decision was reached prior to negotiation of the contract of sale though no steps had been taken to carry it out. During negotiations for the sale the purchaser was advised of this decision.

On their 1953 Federal income tax returns, petitioners Marks and Harteveld claimed demolition losses with respect to the property which were computed in the following manner:

Buildings—McMillan Street, Cincinnati, Ohio.

| | |
|---|---:|
| Cost | $18, 818. 32 |
| Depreciation to date of demolition 7–13–53 | 10, 588. 12 |
| Remaining cost at demolition | $8, 230. 20 |
| Cost of wrecking buildings | 1, 125. 00 |
| Total loss | $9, 355. 20 |
| ½ allocable Dolph Harteveld | $4, 677. 59 |
| ½ allocable Henry A. Marks | 4, 677. 59 |

Respondent disallowed these deductions in full, and included the adjusted basis of the demolished buildings and their removal cost in the basis of the property sold, thus reducing the gain reportable upon the sale of the property under consideration.

In June of 1952 Dolph Harteveld loaned a sum of money to a syndicate, of which he was a member, formed to operate a resort in the Bahamas. The syndicate was incorporated in December 1952. On his Federal income tax return for 1953 Harteveld claimed a business bad debt deduction of $8,500 with respect to this loan. Respondent determined that the deduction was allowable as a nonbusiness bad

debt. The debt arising out of this transaction was, at the time of its worthlessness, a nonbusiness bad debt.

## OPINION.

On brief respondent has conceded that the provisions of section 112(c) are not applicable to the individual petitioners; and further has conceded that, with the exception of petitioner Henry A. Marks, the provisions of section 115(g)(1) are not applicable to them. Thus respondent apparently has acknowledged that the individual petitioners, excepting Henry Marks, properly reported the amounts received for their stock, in excess of their basis therein, as long-term capital gains.

With respect to the tax effect of the transaction upon Model, respondent contends the various steps thereof constituted interdependent steps in an overall plan, the objective and result of which was the sale by Model, and the purchase by Alsco, of Model's linen supply assets. In support of this position he argues that Alsco was solely interested in purchasing Model's linen supply assets, and in fact conditioned its participation in the transaction upon the acquisition of those assets free and clear of all other obligations; that Model utilized Alsco's interest in acquiring the linen supply assets to dispose of an entire segment of its business, the continuation of which would have proved costly, and thus acquired the funds it sought for the development and expansion of the remaining portion of its business; and that the negotiated sales price of the "stock" was equated to what the parties considered to be the market value of the assets sought by Alsco. He submits the transaction was cast in the form of a stock purchase and sale solely to secure for Model and the Model stockholders the most favorable tax result. Finally, he urges that Alsco's ownership of Model's stock was so transitory as to have no legal significance.

At the outset we note that any single approach to this problem presents an inherent difficulty, since the transaction under consideration was designed to and, as we see it, did accomplish three separate and distinct objectives, each of which was actively sought by one of the parties. First, those of Model's stockholders who desired to do so were able to dispose of their individual stock interests in the corporation. Second, Model disposed of the linen supply part of its business, thus raising needed capital with which to liquidate existing obligations and underwrite its plans for future expansion of the remaining laundry business. Third, Alsco acquired Model's much wanted linen supply assets, thereby entering the linen supply business in the Cincinnati area. Consequently, the substance of what occurred

conceivably can very well differ depending on the position from which the transactions are viewed. The decision is not an easy one.

After a most careful consideration of the entire record, however, we have concluded that the underlying factor which gave rise to the instant series of events was the desire of the individual petitioners, excepting Henry Marks, to sell their Model stock. The record clearly indicates that it was this desire which brought about the initial contact with Alsco. Furthermore, Alsco's repeated insistence upon a purchase of assets rather than the purchase of stock was met by a consistent refusal on the part of the individual petitioners to sell anything but their stock, so that when Alsco finally formalized its end of the bargain, it took the form of an offer to buy stock, with the understanding that Model would accept the stock from Alsco in return for Model's linen supply assets. Nowhere in the record does it appear that Model offered to sell assets and we have concluded that Model did not sell assets.

In reaching this conclusion, we have not overlooked the advantages gained by Model as a result of the various transfers. Granted, Model disposed of its linen supply assets, but this disposition was by way of a partial liquidation of its business, and not, as respondent maintains, by way of a sale. The formal steps taken by Model are consistent with this conclusion. Prior to the transaction, Model had 61,795 shares of stock outstanding and was in the linen supply business, owning assets in connection therewith which it valued at some $1,900,000. After the transaction it had reduced its outstanding stock to 16,319 shares, eliminated its linen supply business, and no longer held its linen supply assets. Subsequently it retired the 45,476 shares received from Alsco as well as some 59,872 shares of stock held in its treasury. In addition, it filed an amendment to its articles of incorporation with the State of Ohio to evidence its capital reduction and partial liquidation. Thus it appears to us, that Model intended to and did dispose of its linen supply assets for the stock which Alsco bought from the selling stockholders, and not for cash as now argued by the respondent.

It is also highly significant that, though Alsco parted with cash in the amount of $1,909,992, as a result of the various exchanges, none of that money came into Model's ownership. True, it received some $773,092, but this represented a refinancing of its obligations and was evidenced by debentures, the validity of which as indebtedness we do not understand respondent to question.

Moreover, we cannot agree that the transaction was cast in the form of a stock sale solely to acquire the most favorable tax results. The retiring stockholders primarily wanted to sell their stock, and that, and not tax savings alone, was the reason the transaction took the

form it did. As shareholders of a validly existing corporate entity they were entitled to avail themselves of this method of disposing of their interests. Real rights and liabilities were created by virtue of the exchanges which we believe cannot be ignored.

In any event, that the insistence upon a stock sale might have been motivated at least in part by a desire to save taxes is immaterial, for tax reduction by whatever legal means available is a taxpayer's prerogative, and will be honored where, as here, the means employed have substance.

As authority for his position, respondent relies on *Commissioner* v. *Ashland Oil & R. Co.*, 99 F. 2d 588 (C.A. 6, 1938), certiorari denied 306 U.S. 661 (1939); and *Estate of James F. Suter*, 29 T.C. 244 (1957); as well as *Helvering* v. *Limestone Co.*, 315 U.S. 179 (1942); *Bausch & Lomb Optical Co.*, 30 T.C. 602 (1958), affd. 267 F. 2d 75 (C.A. 2, 1959); and *Ethel K. Lesser*, 26 T.C. 306 (1956). He maintains that a sale of assets is what was intended, a sale of assets is what occurred, and all else was artifice devised to mask the true substance of the transaction in a form which he would disregard on the authority of *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945), and related cases.

The question before us, however, is one of fact, turning as it does on the intentions of the parties and the interpretation to be placed on their acts, and the cited cases are material only insofar as they are authority for the recognition of substance over form. Moreover, excepting *Court Holding Co.*, they deal with the reorganization provisions of the Code as viewed from the aspect of an acquiring entity. While we have little doubt but that Alsco, the acquiring entity in the transaction before us, was interested primarily in Model's linen supply assets, we are not disposed in the light of the other facts of record to label this transaction as a sale by Model of its linen supply assets.

In short, we have concluded that each step of the December 18 transaction should be recognized and given its full tax effect, and that its real character was a sale of stock followed by a partial liquidation. The steps taken by the parties had substance and as we see it, were taken in reality and good faith.

Since we have concluded that the substance of the transaction was a bona fide sale of stock followed by a partial liquidation, we do not reach the issue of Model's basis for its linen supply assets.

The next issue concerns the basis of the individual petitioners for the 45,476 shares of stock sold to Alsco. Respondent determined each share had a basis to them of $18. The record indicates petitioners originally bought the stock for $18 a share plus a commission per share of 50 cents. It further indicates that, upon its sale, they were liable for the cost of transfer stamps, computed at 6 cents per share.

With the exceptions of Henry, Hermina, and Stanley Marks, petitioners assert a gain on the sale of their stock which reflects a claimed basis of $18 per share, in addition to which they claim credit for the cost of the transfer stamps. Henry A. Marks asserts a basis of $18.19 per share for the shares sold to his son; Hermina M. Marks asserts a basis of $18.25 per share; and Stanley A. Marks asserts a basis of $18.20 per share, in addition to which he claims credit for the cost of the transfer stamps.

Commissions paid for the purchase of securities represent a part of their cost, and are to be taken into consideration only in the determination of the amount of gain or loss sustained upon the subsequent disposition of such securities. Regs. 118, sec. 39.24(a)-2, *Helvering* v. *Winmill*, 305 U.S. 79 (1938). Additionally, Federal stamp taxes paid upon the transfer or conveyance of securities by a nondealer constitute selling costs to be taken into account in determining the gain or loss sustained upon their sale. I.T. 3806, 1946-2 C.B. 41. It thus appears that, to the extent claimed, petitioners are entitled to take into account the 50 cents commission and the cost of the transfer stamps in computing the gain on the sale of their stock.

We next consider respondent's determination that the amount received by Henry Marks from his son Stanley, on account of the latter's purported purchase from his father of 2,202 shares of Model stock, constituted an amount taxable to Henry as a dividend under the provisions of section 115(g) of the 1939 Code.[2]

Respondent contends that, in light of the dominant stockholder position enjoyed by the Marks family with respect to Model prior to the December 18 sale to Alsco, the transaction between Henry and his son is subject to close scrutiny. He further maintains that this scrutiny reveals various factors which support his determination, i.e.: Stanley's failure to pay for the shares purchased until after the sale to Alsco; Henry's emergence as Model's controlling shareholder; and Model's dividend reduction policy which was instituted during Henry's term as its president.

Whether a distribution is essentially equivalent to a taxable dividend, is a question of fact. *Woodworth* v. *Commissioner*, 218 F. 2d 719 (C.A. 6, 1955), affirming a Memorandum Opinion of this Court dated October 30, 1953.

---

[2] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(g) REDEMPTION OF STOCK.—

(1) IN GENERAL.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

Assuming the exchanges between Henry, Stanley, Alsco, and Model resulted in a redemption of Henry's stock by Model, a point vigorously contested by petitioners, we are still unable to conclude that they also resulted in a distribution to Henry which was essentially equivalent to a taxable dividend. The record indicates that Stanley acquired the stock from his father in order to make up the necessary 45,476 shares involved in the transaction with Alsco. Thus it would appear that Henry participated in the disposition of the shares partly to accommodate his son and partly to accomplish the contraction of Model's business which he desired. The record further indicates that the various exchanges actually did result in a well-defined contraction of Model's business; a substantial change in Model's stock ownership; a reduction in Model's inventory; and a liquidation of Model's short-term indebtednesses. In fact, short of the existence of a surplus adequate to cover a distribution, and the existence of a meager dividend policy, this record fails to reveal any of the classic criteria otherwise relied upon by the courts as evidence of a dividend equivalence. In the light of all the facts of record, we are persuaded that the transaction between father and son amounted to a bona fide sale of 2,202 shares of Model stock by Henry to Stanley, and that the sales price was not equivalent to a dividend.

Furthermore, Henry's emergence as Model's majority stockholder does not seem strange, inasmuch as he enjoyed that position prior to the instant exchanges. Moreover, Stanley's financial position coupled with his execution of a binding promissory note to his father, make immaterial the fact that the purchase price for the 2,202 shares was not paid until after the December 18 transaction. Actually, the record indicates that the postponement was solely for the sake of convenience.

We hold for petitioner Henry Marks, on this issue.

The next issue concerns respondent's disallowance of a deduction in the amount of $9,125.41 claimed by Model, which allegedly represented ordinary and necessary business expenses incurred by it upon the transfer of its assets to Alsco, the amendment of its corporate charter, the redemption and cancellation of its stock, and the issuance of its bonds.

Of the total amount claimed, $1,500 represented a legal fee paid for the preparation and registration of Model's debentures, and $850.41 represented the tax paid upon their issuance. On brief petitioners have conceded these two items. However, they contend the remainder of the amount claimed represented miscellaneous expenses attendant upon Model's partial liquidation, and as such are deductible.

The weakness in petitioners' position is that they have failed to establish the nature of these miscellaneous expenditures. While expenditures made in partial liquidation of a corporation may represent

ordinary and necessary business expenses, they may also represent capital expenditures, depending on the nature of the particular expense. *Mills Estate, Inc.*, 17 T.C. 910 (1951), reversed in part 206 F. 2d 244 (C.A. 2, 1953). Thus, a general claim that various expenditures were made in connection with a partial liquidation is insufficient to establish their deductibility as ordinary and necessary business expenses. There must be a further showing that no part thereof represented the cost of a capital item. Failure to make this showing constitutes a failure of proof.

We sustain respondent on this issue.

Respondent also disallowed a deduction claimed by Standard in the amount of $3,000, allegedly representing legal fees incurred by it upon its dissolution. The disallowance was premised on respondent's determination that "such payments constitute capital expenditures under the provisions of section 24(a) of the Internal Revenue Code of 1939, and/or since such payments were made on behalf of the Model Laundry Company."

Petitioners' position is that these fees were paid by Standard upon its complete liquidation, and therefore, even if capital in nature, were deductible as any other unrecovered organization or reorganization expense. However, they do not address themselves to the second part of respondent's determination, i.e., that the expenditures were nondeductible because they were made on behalf of Model.

Standard was Model's wholly owned subsidiary. Both Model and Standard played active parts in the series of events allegedly giving rise to the claimed deduction. The fees in question were paid to a firm which represented both entities throughout the transaction. It was incumbent upon petitioners to prove the nature of the fees and on whose behalf the expenditures were made. This they failed to do. We sustain respondent's determination.

The next issue concerns the deductibility of a demolition loss claimed by Henry Marks and Dolph Harteveld. Marks and Harteveld owned certain property upon which were located 4 buildings in an advance state of disrepair. At least 5 years prior to 1953, the City of Cincinnati had threatened to issue orders against the buildings, and at least 6 months prior to July 1953, had issued an order that these structures be ratproofed, an undertaking which would have required the expenditure of some $700,000 to $800,000. Marks and Harteveld then decided to demolish the structures sometime in the future, but took no immediate steps to do so. Then, in July of 1953, they contracted to sell the property to a third party who intended to utilize it for a parking lot. During the negotiations, petitioners informed the purchaser of their decision to raze the structures. As executed, the contract of sale provided that the sellers were to take the steps necessary to clear

the existing buildings from the premises. Petitioners razed the buildings as required by the contract of sale, and claimed a deduction equal to their adjusted basis plus the cost of their removal. Respondent disallowed the deduction in full. However, he included the entire amount so claimed in the basis of the property sold, thus decreasing the gain reported by petitioners on the transaction.

We hold respondent's determination to be correct. It was expressly provided in the agreement of sale that petitioners were to take all the necessary steps to clear the premises. It was further provided therein that the purchaser intended to utilize the property for the erection of a parking lot, an intention which would have been frustrated by the existence of the structures. While it appears that petitioners had decided to raze the buildings prior to their negotiations with the purchaser, nothing was done to effectuate that decision until after the execution of the sales contract. It is clear that a demolition loss is occasioned not by the decision to demolish, but rather by the actual destruction of property itself. In this state of the record, we cannot say that the demolition occurred independently of the sale of the property. Rather it appears to have been motivated by the offer to purchase. Under these circumstances, we are of the opinion that petitioners have failed to show that respondent erred in treating the expenses of the demolition as a cost of sale. Cf. *Blumenfeld Enterprises, Inc.*, 23 T.C. 665 (1955), affd. 232 F. 2d 396 (C.A. 9, 1956), and *RKO Theatres, Inc.* v. *United States*, 163 F. Supp. 598 (Ct. Cl., 1958).

Moreover, the $1,125 removal cost could under no circumstances be considered to represent a deductible demolition loss. A demolition loss is limited to the adjusted basis of the property at the time of its destruction. *William Heyman*, 6 T.C. 799 (1946). The cost of clearing the property represented a capital expenditure, and served to increase the basis of that property. Thus respondent was also correct in disallowing the claimed deduction to this extent.

The final issue involves respondent's determination that a bad debt deduction in the amount of $8,500, claimed by the Hartevelds in 1953, was a nonbusiness bad debt, and not a business bad debt as contended by the petitioners. We agree with respondent. No issue is raised with respect to the amount of the debt, or its worthlessness.

Section 23 (k) (1) of the 1939 Code permits an individual to deduct from gross income those debts which become worthless during the taxable year; however, the benefits of that subsection are denied nonbusiness bad debts as defined in 23 (k) (4), which are deductible only as short-term capital losses in the year of their total worthlessness. It is well settled that whether a debt is one deductible under 23 (k) (1) or (k) (4) is a question to be determined as of the year in which the actual worthlessness occurs. If, at that time, the loss resulting from

the worthlessness is proximately related to the taxpayer's then trade or business, the debt is one deductible under (k)(1). If, at that time, no such proximate relationship exists, the debt is only deductible under (k)(4). Regs. 111, sec. 29.23 (k)-6; *Hadwen C. Fuller*, 21 T.C. 407 (1953); *Charles G. Berwind*, 20 T.C. 808 (1953), affd. 211 F. 2d 575 (C.A. 3, 1954).

A review of the facts reveals that Harteveld loaned the amount in issue to a syndicate in June of 1952. In December of that year, the syndicate was incorporated. The advance became worthless in 1953, and the deduction was then claimed. It is thus apparent, that at the time of worthlessness, the loss was related, not to Harteveld's trade or business, but rather to the trade or business of the corporation. No citation of authority is necessary for the principle that the business of a corporation is not that of its stockholders. On the record before us, petitioners have not shown a proximate relationship between the loss resulting from the worthlessness and Harteveld's trade or business. Respondent is sustained on this issue.

*Decisions will be entered under Rule 50.*