Simmons Mill and Lumber Co., Inc. v. Commissioner.
Simmons Mill & Lumber Co. v. Commissioner
Docket No. 93414.
United States Tax Court
T.C. Memo 1963-185; 1963 Tax Ct. Memo LEXIS 159; 22 T.C.M. (CCH) 894; T.C.M. (RIA) 63185; July 5, 1963
Milo Whitney Smith, One Montgomery St., San Francisco, Calif., for the petitioner. Frank E. Phillips and Edward M. Fox for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined the following deficiencies in petitioner's income tax: Taxable Year Ended
Deficiency
January 31, 1956
$12,781.02
January 31, 1957
952.70
Period
February 1, 1958 to August 1,
1958
899.60
Total
$14,623.32 The sole issue is whether a claimed deduction of $41,296.77 for the taxable period February 1 to August 1, 1958, was an abandonment loss within the purview *160 of sections 165[1] or 167. The earlier taxable years are affected by virture of claimed net operating loss carrybacks resulting from the asserted abandonment loss. Some of the facts have been stipulated and are so found. Petitioner Simmons Mill and Lumber Co., Inc., was a corporation duly incorporated under the laws of the State of California. During all times material hereto, petitioner's principal place of business was located at 11719 South Alameda Street, in the City of Lynwood, in Los Angeles County. Petitioner prepared its returns for Federal income tax purposes on the fiscal year basis using the cash method of accounting. The returns for the period March 1, 1955 to January 31, 1956, the year ending January 31, 1957, and the period February 1, 1958 to August 1, 1958, were timely filed with the district director of internal revenue at Los Angeles, California. Petitioner was organized and incorporated under the laws of the State of California on February 1, 1955, and began business at 11719 South Alameda Street by taking over the assets, liabilities, and going lumber and milling business which had been operated *161 by Sidney N. Simmons (hereinafter called Sidney) as a sole proprietorship for several years. The assets were assigned to petitioner by Sidney and Ann G. Simmons (his wife) in exchange for all the stock in the corporation. Simmons and his wife then each owned 50 percent of such stock. Among the assets acquired in exchange for its stock were building and ground leases covering the land and improvements located at 11719 South Alameda Street. Petitioner leased a substantial portion of its premises to Simmons Hardwood Lumber Co. (hereinafter called Hardwood Co.). Hardwood Co. (a limited partnership) was actively engaged in the wholesale lumber business while petitioner was engaged in the custom milling business. Petitioner continued leasing the land and improvements located at 11719 South Alameda Street until March 20, 1957, on which date it purchased said land and improvements. The purchase price paid therefor was $77,545.80. On petitioner's books of account, $25,900 of said purchase price was allocated to the land and $51,645.80 therefor was allocated to depreciable assets. National Cylinder Gas Co., Inc. (hereinafter called National), a corporation which conducted business on a *162 nation-wide basis, maintained a branch office on property located at 11711 South Alameda Street, which property was directly north of 11719 South Alameda Street and immediately adjacent thereto. Lester M. Cantrell (hereinafter called Cantrell) operated a business known as Lincoln Machinery Co. on property to the west of, and adjacent to, the 11719 South Alameda Street property. Commencing during February 1957, and continuing until September 1957, petitioner, National, and Cantrell participated in a series of negotiations in an attempt to effectuate a three-way exchange of portions of their real property to facilitate usage thereof by them in their respective businesses. National was seeking bare land in order to add a railroad spur track to its property, and was particularly interested in frontage on Alameda Street. National suggested that petitioner could move its business to adjacent land as a result of the contemplated exchange. In connection with these negotiations, petitioner contacted a construction company for the purpose of obtaining a cost estimate with respect to certain work which would be necessitated as a result of the three-way exchange, if consummated. On July 2, 1957, petitioner *163 received an estimate for "Relocation of Lumber Yard" from the construction company. Said estimate stated in part: We propose to furnish all materials and labor necessary to perform the following: 1. Remove and scrap all existing old fencing materials, relocate present chain link fences and gates and furnish new materials in accordance with your outling to the Southern California Fence Co…. $1,485.00 2. Break-up and bury existing concrete slabs and foundations, as necessary to accomplish paving. Paving to include approximately 60,000 sq. ft. of asphalt concrete 4inch thick, utilizing approximately 600 yds. of new fill for grading and drainage corrections…. $14,366.00 3. Furnish and erect a new prefabricated metal storage shed approximately 20 ft. X 300 ft. with 16 ft. eaves. Same to include concrete footings as required by the building code… $13,180.00 4. Disconnect all utilities and waste lines as required. Demolish the present wood storage building at the rear of the present office building. Dispose of the present wood office building 20feet X 20feet, small steel building 15feet X 20feet, fabricated steel building 30feet X 70feet and wood lean-to shed. Move the existing *164 office building and provide foundations, electrical power supply plumbing hookup as required. Plumbing to include the installation of a new cesspool, and water and gas connections to the meters as located by the Public Utilities. Old cesspool to be abandoned and filled. The present shower in the office building is not to be re-connected at the new location. Existing prefabricated rigid frame steel storage building to be removed from present location and relocated at the South-West corner of the new lot complete with footings as required… $12,516.00 Proposal includes all permits, fees, plot and elevation plan and taxes. all for the sum of FORTY ONE THOUSAND FIVE HUNDRED FORTY SEVEN DOLLARS ($41,547.00 Tax Incl.) The above-mentioned negotiations failed to materialize in an exchange of land and, accordingly, such negotiations were terminated. Subsequently, on September 27, 1957, there was a meeting in the office of Louis Naiditch (hereinafter called Naiditch) which was attended by C. E. Reece, district manager of National, M. K. McEniry (hereinafter called McEniry), assistant district manager of National, Naiditch, attorney for petitioner, an auditor or accountant employed *165 by petitioner, and Sidney. The purpose of said meeting was to discuss the possible sale of petitioner's property located at 11719 South Alameda Street to National. At said meeting, Sidney, representing petitioner, offered to sell said property for $200,000. Said offer contemplated petitioner's removal of all buildings from the land, including drying kilns, but would leave any building foundations on the property. The move would have been completed by February 1, 1958. Petitioner's original offer was not acceptable to National, and, accordingly, negotiations continued at various conferences until a purchase price of $177,500 was ultimately agreed upon. The petitioner's corporate minute book states that on January 27, 1958, it adopted a plan of complete liquidation pursuant to the provisions of section 337. On February 26, 1958, petitioner executed an agreement with National entitled "Purchase and Sale Agreement." Said agreement pertained to the property located at 11719 South Alameda Street and provided, in part, the following: 1. Representations of Seller: * * * 2. Real Estate and Purchase Price. SELLER hereby sells to BUYER and BUYER hereby purchases from SELLER, *166 said REAL ESTATE as bare land without any of the improvements now thereon for the sum of One Hundred Seventy-seven Thousand Five Hundred Dollars ($177,500.00), payable as follows: Twenty-five Thousand Dollars ($25,000.00) into, and at time of opening of, the escrow hereinafter referred to; One Hundred Twenty-seven Thousand Five Hundred Dollars ($127,500.00) into escrow on or before the close thereof; and Twenty-five Thousand Dollars ($25,000.00) outside of escrow, at time SELLER surrenders possession of said REAL ESTATE. 3. Removal of Improvements and Change of Possession. SELLER shall deliver possession of said REAL ESTATE to BUYER on or before the 1st day of June, 1958, and subsequent to close of escrow and prior to the delivery of possession thereof to BUYER, SELLER shall remove at its expense, and at no expense to BUYER, all of the improvements presently located upon said REAL ESTATE, providing, however, that SELLER may, at its option, elect not to remove any of the following: (1) All boundary line wire fencing; (2) Concrete building foundations, subsurface utility lines and conduits, and all subsurface construction or subsurface inprovements; (3) That certain cement *167 block building located on the southeasterly portion of said REAL ESTATE; (4) All railroad trackage, if any. All loose debris shall be removed by SELLER at its expense, and at no expense to BUYER, and said REAL ESTATE shall be left by SELLER in a neat and clean condition. SELLER shall not suffer or permit any Mechanics' Liens to be filed against said REAL ESTATE or any part thereof. * * * On February 26, 1958, the following depreciable buildings and improvements were located on, and affixed to, the land at 11719 South Alameda Street: Building or Improvement
Number
Office building
1
Lumber shed
2
Lumber shed
3
Lumber shed
4
Mill building
5
Boiler house
6
Kiln
7
Kiln
8
Fences and gates
Surface paving
Blower system
Electrical installation
During this period, Sidney contemplated that Hardwood Co., in which he and his wife were the only general partners, would purchase and remove some of the improvements to a new site. Hardwood Co., however, found another location where new buildings would be used, and hence did not have use for most of the relevant improvements. Building No. 6 was removed to the new site. Prior to January 27, 1958, petitioner *168 leased from Cantrell certain land located to the west of, and adjacent to, the property located at 11719 South Alameda Street. Subsequent to the adoption of its plan of complete liquidation, petitioner negotiated with Cantrell for the cancellation of the unexpired term of said lease. As partial consideration for the cancellation of said lease, petitioner caused Building No. 4, having an adjusted basis of $3,414.42, and Building No. 5, having an adjusted basis of $1,925.21, to be severed from the land and transferred to Cantrell. Building No. 2 was demolished and the lumber was hauled away by a junk man who did the work in return for salvage of materials. Petitioner demolished Building No. 8. Building No. 3 was transferred to Rex Wall Dry Kiln Company for the cost of hauling it away, and it was so removed. Hardwood Co. took the only usable part of a blower system, contained in Building No. 5. No efforts were made to dispose of the yard paving, fence, gates and electrical installations. Petitioner placed a "for sale" sign in its office regarding sale of certain of the assets. Subsequent to January 27, 1958, with the exception of property sold pursuant to the aforementioned Purchase *169 and Sale Agreement of February 26, 1958, petitioner's only sales of assets in connection with liquidation under section 337 were as follows: Boiler and kiln equipment - sold March 14, 1958
Sales price
$15,000.00
Adjusted basis
5,159.15
Gain
9,840.85
Gerlinger lift truck - sold on February 12, 1958
Sales price
$ 3,000.00
Adjusted basis
3,125.00
Loss
$ 125.00
Building No. 6 - June 27, 1958
Sales price
$ 3,300.00
Adjusted basis
2,073.92
Gain
$ 1,226.08
After the February 26, 1958 contract of sale, Sidney had discussions with McEniry. Sidney offered to sell Building No. 1 to National, but National refused. McEniry told Sidney that the spur track would be placed so that Building No. 1 could not be left standing in the same position. McEniry stated that National could use Building No. 1 during construction of the spur track. Sidney then offered to give National the building and McEniry accepted, stating that petitioner should leave it where it was and National would move it later. National had moved Building No. 1 to another position and was still using it by trial time as a storage building. Petitioner asked whether National could use Building No. 7 *170 and McEniry replied: "Well, temporarily we can." Building No. 7 was left on the property for National's temporary storage use. National also contemplated using the demolished material from said building as fill for foundations for new buildings, but it later discovered that this could not be done. By trial time, National had demolished or hauled away Building No. 7. By letter dated April 22, 1958, and addressed to Robert P. Hastings (hereinafter called Hastings), attorney for National, Naiditch requested permission for petitioner to leave and not be required to remove the office building (Building No. 1) and either or both of the cement block kiln buildings (Building No. 7) located on the southeasterly portion of the relevant land. Said letter stated in part: You will please recall that it is provided in Paragraph 3 of said Agreement that seller may elect, on vacating the sold premises, not to remove any of the following improvements: "(1) All boundary line wire fencing; (2) Concrete building foundations, subsurface utility lines and conduits, and all sub-surface construction or sub-surface improvements; (3) That certain cement block building located on the southeasterly *171 portion of said real estate; (4) All railroad trackage, if any." Request is respectfully made on behalf of seller that in addition to the above improvements which seller is not required to remove from the premises, that the seller be permitted, at its option, to leave on the premises, and not be required to remove therefrom the following: (a) Existing office building; (b) An existing cement block building in close proximity and immediately adjoining the cement block building referred to as item 3 of Paragraph 3, above quoted. By way of explanation of the last item, I understand that there are two cement block buildings located on the southeasterly portion of the real estate, which are a matter of inches apart. It is not clear as to whether item 3 of Paragraph 3 of the Agreement would cover both of the buildings or only the most southeasterly building. Accordingly, I request that we be permitted at our election to leave, and not be required to remove, either or both of said buildings. Petitioner did not request permission to similarly leave Buildings No. 2 and No. 8 because Sidney thought that these buildings would be of no value to National. By letter dated May 1, 1958, and *172 addressed to Naiditch, Hastings, on behalf of National, granted the permission requested in the aforementioned letter of April 22, 1958. Said May 1, 1958, letter stated in part: Our client, National Cylinder Gas Company, has advised us, under date of April 28, as follows, with regard to the request contained in your letter to me of April 22nd last: "We are in receipt of your letter of April 23, 1958, in which you enclosed a copy of a letter from Mr. Louis Naiditch requesting that certain improvements be allowed to remain on the premises. We have discussed the matter with our Engineering Department and they are in agreement that we should accede to Mr. Naiditch's request. In the event Simmons should elect to remove any of the specified improvements, the removal of such structure should, of course, be completed by Simmons prior to the taking of possession by National Cylinder Gas Company." Petitioner was obliged to clear the land of all improvements other than those which it had an option to leave. By letter dated May 15, 1958, and addressed to Hastings, Naiditch, on behalf of petitioner, advised National that petitioner elected not to remove the buildings and improvements described *173 in subparagraphs (1), (2) and (3) of paragraph 3 of the aforementioned Purchase and Sale Agreement of February 26, 1958, and in subparagraphs (a) and (b) of the aforementioned letter of April 22, 1958. Said May 15, 1958 letter stated in part: This is to advise that the seller has elected to abandon, and accordingly not to remove, any of the improvements described in subparagraphs (1), (2) and (3) of Paragraph 3 of the Agreement of February 26, 1958 and the items referred to as subparagraphs (a) and (b) of my letter to you of April 22, 1958 (which was approved by your letter of May 1, 1958). Our client Simmons Mill & Lumber Co. Inc. plans on delivering possession of the premises to your client on or before June 1, 1958, in accordance with requirement of the said Agreement. However, we respectfully request permission of National Cylinder Gas Company that our client may remain in possession of the office building with reasonable access thereto, including parking, for a period not beyond July 1, 1958. * * * On July 1, 1958, petitioner vacated the property located at 11719 South Alameda Street and delivered possession thereof to National. Petitioner's income tax return for the taxable *174 period ended August 1, 1958, reflects that the adjusted bases of the depreciable assets remaining on said property on July 1, 1958, or previously demolished, were as follows: Building
Adjusted
No.
Asset
Basis
1
Office building
$ 7,286.06
2
Lumber shed #1
2,536.91
3
Lumber shed #2
2,038.96
7
Kiln #1
13,157.30
8
Kiln #2
11,564.34
Yard construction - paving
2,502.07
Yard construction - fence and
gates
1,167.77
Blower system
580.33
Electrical installation
321.02
Miscellaneous mill equipment
142.01
Total
$41,296.77 On said tax return petitioner claimed a deduction for an abandonment loss in the amount of $41,296.77. With the exception of miscellaneous mill equipment, all of the other above-mentioned assets remaining on the land were improvements which were attached or affixed to the land. The amount of the abandonment loss deduction attributable to the improvements attached or affixed to the land was $41,154.76. The minutes of a meeting of petitioner's board of directors conducted on May 26, 1958, state in relevant part: Upon motion made, seconded and unanimously carried the following resolution was adopted: WHEREAS, *175 it appears that the improvements and fixtures hereinafter described are of no substantial economic value to this corporation, that the same cannot be profitably sold or otherwise disposed of, and that it would be to the interest of the corporation that the same be abandoned, NOW, THEREFORE, BE IT RESOLVED that the hereinafter described improvements and fixtures now situated and located at 11719 So. Alameda Street, Los Angeles, are hereby adandoned, to wit: (1) All boundary line wire fencing; (2) Concrete building foundations, subsurface utility lines and conduits, and all subsurface construction or subsurface improvements; (3) Two cement block buildings on the southeasterly portion of said premises; (4) All railroad trackage, if any; (5) Existing office building. The minutes of a meeting of petitioner's board of directors conducted on July 15, 1958, state, in relevant part: Upon motion made, seconded and unanimously carried the following resolution was adopted: WHEREAS, it appears that the structures hereafter described and located on the real property situated at 11719 South Alameda Street, Los Angeles cannot be advantageously sold or otherwise used, and the same *176 are without value to this corporation, NOW, THEREFORE, BE IT RESOLVED that the following described structures are hereby abandoned and the officers of this corporation are directed and instructed to cause to have the same demolished and removed from the real property located at 11719 South Alameda Street; said structures herein referred to are described as follows: (a) A lumber shed lying on the northerly portion of said premises, immediately to the north of the office building. (b) A kiln building lying in the southeast area of said premises (to the north of the two kiln buildings previously abandoned by this corporation). (c) Fixtures, equipment or other contents within: (i) A boiler room, in approximately the center of the southerly portion of said premises. (ii) The most southerly kiln buildings located at or about the southeasterly portion of said premises, and (iii) The kiln building described in (b) above. The issue is whether certain claimed losses were properly considered abandonment losses within the purview of sections 165[2] and 167. [3] At issue are improvements which were demolished or removed prior to National's taking possession of the land and improvements *177 which passed to National with the land. Petitioner cites Regs. 1.167(a)-8(4) and 1.165-3(b)(1) and argues that its intention was irrevocably never to retrieve or use the assets again, and that such intention was formed subsequent to its acquisition of the assets. But neither of these factors are really in dispute in this case. Respondent's position is simply that under the facts of this case there was no true adandonment. The facts make it very clear that petitioner's dominant motivation throughout was to sell *178 and deliver its bare land under its agreement with National, and this being so, we agree with respondent. As to improvements which were demolished or removed prior to National's taking possession of the land, it was a condition of the sale that these improvements be so demolished or removed. They were demolished or removed in order to put the land in a deliverable state. Since demolition and removal of the relevant assets were inherent facets of the sale of the land, petitioner erred in treating them as ordinary abandonment losses. Standard Linen Service, Inc., 33 T.C. 1; Estate of Clara Nickoll, 32 T.C. 1346, affd. 282 F. 2d 895 (C.A. 7); A. Raymond Jones, 25 T.C. 1100, reversed on other grounds 259 F. 2d 300 (C.A. 5). We further hold that petitioner did not sustain an ordinary abandonment loss for those relevant assets which passed to National with the land. Petitioner had the legal right to remove these improvements or to leave them on the property, where they would pass with the land to National. The principle of Standard Linen Service, Inc., supra, is equally applicable to the transferred *179 assets. We there stated, at page 18: It was expressly provided in the agreement of sale that petitioners were to take all the necessary steps to clear the premises. * * * In this state of the record, we cannot say that the demolition occurred independently of the sale of the property. Rather it appears to have been motivated by the offer to purchase. * * * It is clear that the petitioner has not sustained his burden of proving that the transfer of the improvements occurred independently of the sale of the land. Indeed, the transfer was solely due to the sale of said land. Further, to the extent, if any, that legal adandonment has relevance to tax adandonment, it has been noted, in Goltra v. United States, 96 F. Supp. 618, 625 (Ct. Cl.) affirmed 312 U.S. 203, that: There can be no abandonment of property to another. Abandonment must be made by the owner, without being pressed by any duty, necessity, or utility to himself, but simply because he no longer desires to possess the thing; and, further, it must be made without any desire that any other person shall *180 acquire the same; for if it were made for a consideration it would be a sale or barter, and if without consideration, but with intention that some other person should become possessor, it would be a gift. * * * Decision will be entered for the respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. ↩
3. SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income.↩