Gravois Planing Mill Company v. Commissioner. Charles A. and Florence Beckemeier v. Commissioner.
Gravois Planing Mill Co. v. Commissioner
Docket Nos. 67450, 67451.
United States Tax Court
T.C. Memo 1960-122; 1960 Tax Ct. Memo LEXIS 166; 19 T.C.M. (CCH) 639; T.C.M. (RIA) 60122; June 9, 1960
*166 Held, that no portion of amounts paid by the corporation to attorneys as reimbursements and fees for services in connection with a recapitalization and partial liquidation of the corporation, or an amount paid for a certificate of title, have been shown to be deductible as ordinary and necessary business expenses of the corporation. Standard Linen Service, Inc., 33 T.C. 1. Held, further, that the petitioner Beckemeier first acquired ownership of property distributed to him in the partial liquidation on March 2, 1954, and that he is not entitled to a depreciation deduction on such property for the first two months of 1954. Held, further, that in computing the gain of the petitioner Beckemeier upon the redemption of his stock in the corporation, a paid-up life insurance policy received by him from the corporation is to be included at its fair market value as determined by the respondent, rather than at its cash surrender value. Robert H. Batts, Esq., for the petitioners. Robert A. Roberts, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the taxable year 1954 as follows: Docket
Deficiency in
No.
Petitioner
Income Tax
67450
Gravois Planing Mill Com-
pany
$1,410.79
67451
Charles A. and Florence
Beckemeier
1,410.89
The *167 issue as to the corporate petitioner is whether it is entitled to deduct legal fees and title expense of $2,510.05 and $203, respectively, as ordinary and necessary business expenses. The issues as to the individual petitioner Charles A. Beckemeier are (1) the proper value, to be used in computing gain or loss, for a paid-up life insurance policy received by him from the corporation as part payment for his stock, and (2) whether he in January and February 1954 had such an interest in buildings received in part payment for his stock as entitles him to depreciation deductions for those months. Findings of Fact Some of the facts are stipulated and are incorporated herein by this reference. The petitioner Gravois Planing Mill Company, hereinafter referred to as the corporation, was organized under the laws of the State of Missouri on June 13, 1893, with its principal place of business in St. Louis, Missouri. It filed its Federal income tax return for the calendar year 1954 with the district director of internal revenue, St. Louis, Missouri. The petitioners, Charles A. and Florence Beckemeier, were husband and wife and resided in St. Louis County, Missouri, during the taxable year 1954. *168 They filed a joint Federal income tax return for the calendar year 1954 with the district director of internal revenue, St. Louis, Missouri. The petitioner Charles A. Beckemeier, hereinafter sometimes referred to as Beckemeier, was born September 13, 1886. He was a stockholder and officer of the corporation during the year 1953 and for many years prior thereto, having first acquired stock thereof in 1913. He was its president during the year 1953. During the years 1945 to 1953, inclusive, and as of January 1, 1954, the corporation's issued and outstanding stock was owned as follows: Shares
Charles A. Beckemeier
200
Hobart C. Diringer
75
M. R. Landgraf
50
R. C. Goetting
75
Total
400
In 1945 the corporation and its stockholders entered into an agreement with respect to the sale by any of the stockholders of their stock. Such agreement was renewed and amended from time to time, but essentially the same provisions prevailed at all times until and including the year in question. The agreement recited the desire of the stockholders to provide against the stock falling into the hands of others inimical to the interest of the corporation and the existing stockholders and provided, therefore, that no *169 stockholder should sell his stock without first giving the corporation the opportunity to purchase it. A stockholder desiring to sell his stock was required to give written notice to the then secretary of the corporation and the corporation had 15 days within which to accept or reject the offer to sell. It was provided that annually, within 90 days after the close of any fiscal year of the corporation, the corporation and the stockholders should fix a price for the stock, to be effective throughout the ensuing fiscal period. No formula for fixing the price was provided in the agreement. In the event of the acceptance by the corporation of any offer to sell, the price to be paid was to be the price so fixed, adjusted, however, as of the close of the month next preceding the date of the notice of intention to sell, by taking into account the net earnings or losses and the dividends If for any year a price was not so fixed, it was provided that the last preceding price so fixed should prevail. The corporation was required to pay the price to the stockholder in cash within 90 days after the date of receipt of the offer to sell, and it was provided that the stock should be transferred on *170 the books of the corporation at the time of payment. If the corporation should fail to accept the offer it was required that the stock be offered to the remaining stockholders. In the event of the death of a stockholder the corporation was required to purchase the stock of the deceased stockholder within 90 days after death. For the purposes of such agreement, the price was fixed by the stockholders for each of the years 1945 through 1952, the last price disclosed by the record having been fixed on February 14, 1952, at $1,000 per share, except that in the event of the death of Beckemeier the price for his stock should be $900 per share. In September 1953, Beckemeier orally advised Diringer, secretary of the corporation, that he desired to sell his stock and retire from the business, and told Diringer that he would sell his stock for $1,000 net per share. Thereafter on several occasions Beckemeier discussed the sale of his stock to the corporation with the other individual stockholders and officers. It was also contemplated that some of his stock might be sold to another stockholder, Landgraf, in order that Landgraf might have the same number of shares as the other stockholders, Diringer *171 and Goetting. At some time prior to December 31, 1953, the other stockholders informally agreed to payment by the corporation to Beckemeier of $1,000 net per share for his stock, and that the stock would be transferred to the corporation on December 31, 1953 or January 1, 1954. The net price of $1,000 per share was based upon the last price established pursuant to the 1945 agreement, or was determined in approximately the same way, except that no adjustment was made for the profit or loss of the corporation for the year 1953. However, the corporation did not have sufficient cash available to pay for the stock, and discussions were had as to how payment would be made. Prior to December 31, 1953, Beckemeier advised the other stockholders that he would accept the land and buildings owned by the corporation in part payment for his shares, the remainder to be paid in cash, and the stockholders agreed to this. The corporation was the owner and beneficiary of a fully paid up life insurance policy in the amount of $25,000 on the life of Beckemeier, and the stockholders and officers had intended to surrender the policy and use the cash proceeds to pay Beckemeier. However, Beckemeier offered *172 to take an assignment of the policy in lieu of cash to the extent of the cash surrender value, and suggested writing to the insurance company to ascertain such cash surrender value. The other stockholders agreed. As of January 1, 1954, the value of the land and buildings had not been definitely agreed upon, although the buildings were valued tentatively at $95,000, and the cash surrender value of the insurance policy had not been ascertained. An understanding had been reached that Beckemeier would be removed from the payroll of the corporation at December 31, 1953, and thereafter he received no further salary or compensation from the corporation. On January 2, 1954, Beckemeier sold 25 shares of his stock to Landgraf for $1,000 per share. A regular meeting of the stockholders of the corporation was held on January 11, 1954. Minutes of the meeting, as revised, recite that Beckemeier was a stockholder, and contain the following: "The Chairman stated * * * that he desired to bring to the attention of the stockholders a matter which had been informally discussed by C.A. Beckemeier with the other stockholders, and asked Mr. Beckemeier to explain this matter to the meeting. * * * He [Beckemeier] *173 stated that he desired to offer to the company for liquidation, redemption and cancellation the 175 shares of stock that he still owned in the company, and that while he realized that the company was not in a position financially to distribute to him his entire distributive share in cash, he was willing to accept a distribution of assets of the company, partly in kind and partly in cash, as his distributive share on account of the stock owned by him. He further stated that he was willing to accept for his 175 shares as of January 1, 1954, the real estate of the company, land and building, but exclusive of its machinery, equipment, furniture and fixtures, and other similar assets, which he advised has a fair market value today of $115,200.00, the life insurance policy which the company carried on his life, which he was advised had a fair market value of January 1, 1954, of $17,915.73, together with the sum of $41,884.27 in cash. He explained that his offer to accept the real estate is conditioned that the company lease said property from him for a term of ten years on a basis which would assure him after allowing for depreciation over a ten-year term, a net annual average return of *174 5% on his investment if he retained the property for the full term * * *. * * *
"BE IT RESOLVED, that the offer of C.A. Beckemeier to retire from the business and deliver his remaining 175 shares of stock in the corporation to the corporation for redemption, liquidation and cancellation be accepted, and * * *." The minutes of a special meeting of the stockholders of the corporation held January 11, 1954, state that it was resolved that the capital stock of the corporation should be decreased from 400 shares, par value $100 each, to 225 shares, par value $100 each. On January 25, 1954, an independent appraiser made an appraisal of the land and buildings of the corporation which showed a total value of $144,141 (land $22,975 and improvements $121,166). On the same day, upon being advised of certain defects in the plant wall, the appraiser revised his appraisal to show a total value of $103,716 (land $18,950 and improvements $84,766). At some time after receiving these appraisals the corporation and Beckemeier agreed that the buildings were to be applied toward payment for the stock at a figure of $96,000, rather than $95,000 as had been previously tentatively agreed upon. On January 27, *175 1954, the insurance company by letter advised the corporation that the cash value of the insurance policy as of December 28, 1953, was $17,805.75, and that the value of the accumulated dividends was $109.98, a total of $17,915.73. Thereafter the corporation and Beckemeier agreed that the policy was to be applied at that figure toward payment for Beckemeier's stock. The board of directors of the corporation held a special meeting on March 2, 1954. The minutes of this meeting recite that the president, Diringer, stated that "all the details had now been worked out so that it was now possible for the company to accept the offer of C. A. Beckemeier for the liquidation, redemption, cancellation and retirement of the 175 shares" and that "he recommended that the Board take appropriate action to authorize the liquidation of said shares, transfer the real estate to C. A. Beckemeier, transfer the insurance policy on his life to him, and pay the balance in cash upon receiving his 175 shares for liquidation * * *." At such meeting, the directors resolved that Beckemeier's offer be accepted, that the officers execute and deliver, as of January 1, 1954, a deed to the real estate to Beckemeier; *176 that they assign the life insurance policy to Beckemeier "at its value on January 1, 1954;" that they pay Beckemeier the amount of $41,884.27 in cash; that the 175 shares be retired to reduce the capital stock of the company; that the company enter into a lease with Beckemeier for the land and buildings; and that the corporation borrow $15,000 each from Diringer, Goetting, and Landgraf, in order to provide working funds. On March 2, 1954, Beckemeier transferred his 175 shares of stock to the corporation, and the stock records show that these shares were redeemed and cancelled on that date. On March 3, 1954, amendments to the corporation's articles of incorporation were filed with the Secretary of State of Missouri, reducing the capital stock of the corporation from 400 shares, par value of $100 each, to 225 shares, par value $100 each. On March 2, 1954, the corporation by its president, Diringer, executed a general warranty deed conveying the land and buildings to Beckemeier. The deed recited that it was made and entered into as of January 1, 1954. On March 18, 1954, the corporation asigned the insurance policy to Beckemeier. Thereafter Beckemeier as lessor and the corporation as lessee *177 entered into a lease of the land and buildings "as of the 1st day of January 1954" for a term of 10 years commencing January 1, 1954, at a monthly rental of $1,081.67. It was provided that the lessee should have the right and option at the end of the 10-year term to request the lessor to remove the improvements and construct a one-story plant or to convert the existing improvements into a one-story plant, and that if this were done the lessee should have the right to have the lease extended for a further term of 10 years. In the event the lessor should fail or refuse to make or convert such improvements and thus extend the term of the lease, then the lessee should have the right and option to purchase the property for $19,200 in cash. It has been stipulated that in 1954 Beckemeier received from the corporation for his 175 shares of stock cash in the amount of $41,884.27; land of a value of $19,200; buildings of a value of $96,000; and the insurance policy, the value of which is in dispute. At some time in the latter part of 1953 Beckemeier discussed his proposed retirement from the corporation with Charles Long, an attorney, but apparently Long gave no advice or services at that time. *178 Thereafter the corporation engaged the services of the law firm of Rassieur, Long and Yawitz in connection with the above transaction. On June 15, 1954, the law firm submitted a bill for $2,500 for services rendered and $10.05 for reimbursement of expenditures, namely, $7.80 for filing and recording certificate of amendment to the articles of incorporation and $2.25 for recording the warranty deed. The statement of services is in detail and shows that services were rendered over the period January 4 to March 2, 1954. The services rendered included attendance at numerous conferences; researching the law in regard to liquidation and redemption of the stock; preparing, reviewing, and revising minutes of meetings; advising both the corporation and Beckemeier of the legal and tax consequences of the transaction; preparing waivers of minutes; preparing a certificate of amendment to the articles of incorporation; preparing the lease; and preparing the general warranty deed. The customary charge of this law firm for the mere mechanical steps involved in a recapitalization ranges from $150 to $250, this involving only a few hours' time. The total legal fees were paid by the corporation pursuant *179 to its understanding with Beckemeier that he would receive $1,000 net per share for his stock. On or about April 2, 1954, the corporation paid $203 to a title insurance company for a certificate of title for Beckemeier relating to the land and buildings in question. This fee was also paid by the corporation pursuant to the understanding that Beckemeier would receive $1,000 net per share for his stock. The corporation was not overcapitalized in 1953, and there was no plan to reduce the size of the business of the corporation. At the time of the hearing Beckemeier continued to own the insurance policy, his wife Florence being the beneficiary. The corporation paid Beckemeier rental for the properties commencing January 1, 1954. In its income tax returns the corporation took no depreciation on the buildings after December 31, 1953. In 1953 it had taken depreciation in the amount of $1,091.21. In its income tax return for the taxable year 1954, the corporation claimed the amount of $2,713.05 as ordinary and necessary business expenses, representing the amounts paid to the law firm and for the certificate of title above referred to. In the notice of deficiency the respondent disallowed the *180 claimed deduction on the ground that it did not represent ordinary and necessary expenses of carrying on the corporation's business. In their joint income tax return for the taxable year 1954, the individual petitioners claimed depreciation on the above-referred-to buildings in the amount of $9,600, which was depreciation for the entire year based on a 10-year life. In the notice of deficiency, the respondent disallowed 1/6 thereof, or $1,600, with the following explanation: "In your return you deducted $9,600.00 as depreciation sustained for a full year on the building located at 3026 Juniata Street, St. Louis, Missouri. Depreciation is allowable, however, for only ten months of 1954 since you did not acquire the property until March 2, 1954. Therefore, $1,600.00 (1/6) of the deduction claimed is being disallowed." In their return for 1954 the individual petitioners reported long-term capital gain of $108,200 from the disposition of Beckemeier's 200 shares of stock of the corporation (the 25 shares sold to Landgraf and the 175 shares transferred to the corporation). In such return it was represented that the stock was disposed of on March 1, 1954, that the cost was $91,800, and the *181 selling price was $200,000. In the notice of deficiency the respondent increased the long-term capital gain reported with the following explanation: "It is held that the fully paid up life insurance policy on your life which you received in 1954 as part of the consideration for your surrender of 175 shares of capital stock of the Gravois Planing Mill Company, which you valued at $17,915.73 in computing the long term capital gain reported in your return, actually had a fair market value of $21,639.25 at the time of the transaction. Your taxable income, therefore, is increased by the amount of $1,861.76, representing 50 percent of the increase of $3,723.52 in the amount reported as the fair market value of the policy." Opinion With respect to the corporate petitioner the question presented is whether it is entitled to deduct as ordinary and necessary business expense any part of the amount of $2,713.05 which it expended for attorney's fees and reimbursements and for a certificate of title for Beckemeier covering the property which he received from the corporation. The corporation contends that some portion of these expenditures was made in connection with a distribution in partial liquidation *182 and is therefore deductible, relying upon our prior opinions in Mills Estate, Inc. 17 T.C. 910, reversed in part (C.A. 2) 206 F. 2d 244, and Tobacco Products Export Corporation, 18 T.C. 1100. The facts are set forth in detail in our Findings of Fact. These show that at its inception the plan was for Beckemeier to sell his stock to the corporation pursuant to the existing contract among the stockholders and the corporation. However, later, and before the transfer of the stock to the corporation and the transfers of the properties to Beckemeier were effected, the corporation adopted resolutions couched in terms of a partial liquidation and which provided for the retirement and cancellation of Beckemeier's stock and the filing of amendments to the articles of incorporation to reflect a reduction in the corporation's capitalization.[1] All of Beckemeier's stock was acquired and canceled and the certificate of incorporation was amended. The transaction, as ultimately consummated, literally meets the definition of a partial liquidation contained in section 115(i) of the Internal Revenue Code of 1939. [2] *184 See Lucius Pitkin, Inc., 13 T.C. 547. As stated, the petitioner contends that there *183 was a partial liquidation, and the respondent on brief does not argue that there was not. He makes no point of the fact that there was a lease back of part of the property to the corporation, or that there was no contraction of the business of the corporation. We conclude that there was a partial liquidation of the corporation under section 115(i) of the 1939 Code and the judicial authorities thereunder. Nevertheless, the respondent's position is that none of the expenditures in question constituted ordinary and necessary expenses of carrying on the business of the corporation, but, rather were capital expenditures made in connection with the corporation's acquisition of part of its own shares of stock and for amendment to its articles of incorporation to reflect the redemption of such stock. He refers to the opinion of the Court of Appeals for the Second Circuit which reversed in part Mills Estate, Inc., supra. He also argues that some of the legal fees and the cost of the certificate of title were in reality expenditures for the benefit of Beckemeier which the corporation paid and that, as such, they must necessarily be considered as a part of the cost to the corporation of the stock which the corporation acquired from him. In Mills Estate, Inc., supra, and in Tobacco Products Export Corporation, supra, we took the position that the portion of expenditures *185 incurred in connection with a partial liquidation and recapitalization which relates to the recapitalization are non-deductible capital expenditures, but that the portion which relates to the distribution of assets constitutes deductible ordinary and necessary business expense of the corporation. In that case, although there was no basis for a precise allocation, we allocated a portion of the total expenditures to the distribution in partial liquidation, referring to Cohan v. Commissioner ( C.A. 2) 39 F. 2d 540. A similar allocation was made in Tobacco Products Export Corporation, supra.
In its opinion in Mills Estate v. Commissioner, supra, the Court of Appeals stated that it found it unnecessary to there decide the question whether any expenditures made in connection with a partial liquidation are deductible as a business expense. It took the position that what occurred in that case was a change in the corporate structure for the benefit of future operations, that the costs of that sort of corporate change are not deductible as ordinary and necessary expenses in carrying on a trade or business, that the services for which the attorneys were paid were all necessary steps to accomplish *186 the change of corporate structure, and that such services should not be split into parts and viewed separately to determine the deductibility of the cost of each part as though neither had any connection with the other. It thus in effect held that in such a situation its own prior decision in Cohan v. Commissioner, supra, does not justify or require an allocation of any portion of the expenditures to the distribution in partial liquidation. Subsequently, in Standard Linen Service, Inc., 33 T.C. 1, we held that the taxpayer was not entitled to deduct as ordinary and necessary expenses any portion of certain miscellaneous expenditures in connection with the transfer of its assets in partial liquidation, the amendment of its corporate charter, and the redemption and cancellation of its stock, on the ground that the taxpayer had failed to show that no part of these expenditures represented the cost of a capital item. We also there refused to allow the deduction of legal fees incurred upon the complete liquidation of a corporation, since the liquidating corporation had not established that the fees were paid on its own behalf rather than on behalf of its stockholder. We see no essential *187 difference between the instant case and Standard Linen Service, supra. The detailed statement of the services rendered by the attorneys here indicates that in the main the services were necessary steps in the redemption and cancellation of the stock of Beckemeier and the recapitalization of the corporation. On brief the petitioner places stress on the fact that one of the attorneys representing the corporation in the partial liquidation testified that the customary charge of his firm for the mere mechanical steps involved in a recapitalization ranges from $150 to $250. However there is much more to a recapitalization than the mere mechanical steps. In addition, it may be pointed out that some of the fees were paid for legal services rendered to Beckemeier. Only one item of service might be considered as relating particularly to the actual transfer of assets of the corporation in partial liquidation, namely, the service in preparing the warranty deed to Beckemeier. However, this item would appear to be a relatively insignificant part of the whole services rendered by the attorneys. Also, some of the expenditures, other than legal fees, appear to have been made on behalf of Beckemeier. *188 Unless these circumstances we conclude that the corporation has failed to prove that any portion of the claimed amount constituted ordinary and necessary expenses of its business, and we therefore approve the respondent's disallowance of the claimed deduction. Turning to the issues with respect to the individual petitioner Beckemeier, we will first consider the amount of the depreciation deduction to which he is entitled. The parties are agreed that the depreciable cost to Beckemeier of the buildings was $96,000. Beckemeier in his return for 1954 claimed a depreciation deduction of $9,600, being depreciation for the full year based on a useful life of the property of 10 years. The respondent, taking the position that the petitioner did not acquire the property until March 2, 1954, disallowed depreciation claimed for the first two months of 1954 in the amount of $1,600. The over-all transaction was not completed by January 1, 1954. There remained final decisions to be made as to the value or price at which both the real property and the insurance policy would be transferred. It was not until late in January 1954 that these matters were settled. Furthermore, the exact character of the *189 over-all transaction had not been determined, as indicated in our discussion of the first issue hereinabove. Negotiations continued on well into 1954, and further stockholders' and directors' meetings were necessary. The minutes of the stockholders' and directors' meetings held on January 11 and March 2, 1954, refer to discussions had among the parties prior to January 1954, as only informal discussions. It was not until March 2, 1954, after all elements of the transaction had been settled that Beckemeier transferred his stock to the corporation and received a deed to the property in question. Under these circumstances we think it is clear that not until March 2, 1954, when Beckemeier received the deed, did he have any legal or equitable interest in the buildings. Although prior to January 1, 1954, a tentative oral agreement had been reached to transfer the stock from Beckemeier to the corporation and there had been discussions concerning the transfer of property of the corporation to Beckemeier, it cannot be said that a transfer of any interest in the realty had been effected, or that there was even a legally enforceable contract to transfer the realty. It is our conclusion that the *190 petitioner is not entitled to depreciation on the buildings for the months of January and February 1954. On brief the petitioner Beckemeier argues that if he is not entitled to depreciation for the first two months of 1954, "then the life of the building under the terms of the Lease between Gravois Planing Mill Company and Charles A. Beckemeier would be but 9 years and 10 months, in which event the rate of depreciation would be $813.56 per month as opposed to $800 per month," and states that thus the respondent made a mathematical error. This position presupposes that the respondent has determined that the useful life of the property is limited by the lease. However, the deficiency notice does not so state and we cannot assume that the respondent's determination in the notice of deficiency represented merely a mathematical error. The net effect of the respondent's determination was to allow depreciation over a useful life of 10 years from March 2, 1954. On brief the respondent, in effect, denies that his determination was merely a mathematical error, stating that the asset of a lessor is depreciated over the life of the asset rather than the term of a lease. We need not here decide *191 whether an unconditional agreement to retransfer property at a specified time might be considered as limiting the useful life of property for purposes of the depreciation deduction. Suffice it to say that the provisions in the lease here involved do not establish that Beckemeier's investment in the buildings will be lost at the end of the 10-year term stated in the lease. Beckemeier could defeat the lessee's option to repurchase by making improvements to the buildings and extending the lease for a further term. This does not constitute proof that the buildings will be obsolete at the end of the 10-year term as provided in the lease. Nor is there any other evidence as to the useful life of the property. Under the circumstances, we must approve the respondent's determination with respect to Beckemeier's depreciation deduction for the year 1954. On brief the petitioners state that there is an inconsistency on the part of the respondent in disallowing to Beckemeier the depreciation for the first two months of 1954 and at the same time failing to make an adjustment of the corporation's tax liability to permit it to take depreciation for such two months. However, the corporation did not *192 claim depreciation for the two months and has not raised the issue in its pleadings. Furthermore, there is no evidence, such as cost, estimated life, and depreciation previously taken, upon which we could determine whether and to what extent the corporation would be entitled to depreciation on the property for such two-month period. The final issue is whether the respondent erred, in determining the gain derived by Beckemeier upon the redemption of his 175 shares of stock, by including the paid-up life insurance policy at a fair market value of $21,639.25, rather than using the cash surrender value of the policy, $17,915.73. We have held hereinabove that the transfer of the property, including the insurance policy, from the corporation to Beckemeier was in partial liquidation of the corporation within the meaning of section 115(i) of the Internal Revenue Code of 1939. Section 115 (c) of the Code provides that an amount distributed in partial liquidation of a corporation shall be treated as payment in exchange for the stock and that the gain shall be determined under section 111. Section 111 of such Code (as well as its counterpart, section 1001 of the Internal Revenue Code of 1954), *193 provides that the gain from the sale or other disposition of the property shall be the excess of the amount realized therefrom over the adjusted basis of the property and that the amount realized shall be the sum of any money received plus the fair market value of the property (other than money) received. The parties have stipulated that Beckemeier received cash in the amount of $41,884.27 and land and buildings of a total value of $115,200. This leaves in question only the amount to be included in the computation as the fair market value of the insurance policy. On brief Beckemeier stresses the well established rule that the fair market value of property is the price a willing buyer would pay a willing seller therefor, neither being under any compulsion. He argues that he and the officers of the corporation dealt at arm's length in determining that the stock which would be liquidated had a fair market value of $1,000 per share. He points out that he sold 25 shares to another stockholder at that price. He further argues that while still dealing at arm's length he and the corporation determined the values of the assets which were to be used in making up the $175,000 total liquidation *194 price, pointing out that it had originally been planned that the policy would be surrendered by the company to the insurance company for its cash surrender value and that the cash so obtained would be used in partial payment for the stock. As pointed out above, in a partial liquidation we are concerned with the fair market value of the assets received. The cases cited by the petitioner which do not involve partial liquidations are not in point. The fact that Beckemeier and the corporation agreed to the transfer of the insurance policy at its cash surrender value for purposes of satisfying an agreed price of $1,000 per share is not necessarily determinative of the actual fair market value of the policy. The parties did not bargain to establish the fair market value of the policy. Diringer, secretary of the corporation, testified that he was not aware that the policy had value other than the cash surrender value. In Charles Cutler Parsons, 16 T.C. 256, we held that where the taxpayer transferred certain life insurance policies to the insurance company in exchange for other policies, including a single premium life insurance policy, the single premium life insurance policy received is *195 to be included in the computation of the gain at its fair market value, which is greater than the cash surrender value. In that case we stated in part as follows: "Since the only value realizable at any time prior to petitioner's death was and will be the cash surrender value, the petitioner urges that this would represent the fair market value of the new policy. We do not agree. "The cash surrender value of a life insurance policy is the amount that will be paid to the insured upon surrender of the policy for cancellation. It is merely the money which the company will pay to be released from its contract. * * *
"The cash surrender value is the market value only of a surrendered policy and to maintain that it represents the true value of the policy is to confuse its forced liquidation value at an arbitrary figure with the amount realizable in an assumed market where such policies are frequently bought and sold. Moreover, such an argument overlooks the value to be placed upon the investment in the insured's life expectancy and the protection afforded his dependents. "The rule is, then, that the fair market value of a single premium life insurance policy for the purpose of determining *196 taxable gain derived from exchange of insurance policies is the same price that any person of the same age, sex, and condition of health as the insured, would have to pay for a life policy with the same insurance company on the date the exchange took place. 'This is a reasonable standard and one agreed upon by a willing buyer and a willing seller both of whom are acting without compulsion.' Cf. Ryerson v. United States, (N.D. Ill., 1939) 28 Fed. Supp. 265, 267, affd. (1941) 312 U.S. 260." See also Guggenheim v. Rasquin, 312 U.S. 254 wherein the Supreme Court held that surrender of a single premium life insurance policy is only one of the rights of the owner, and rejected the taxpayer's contention that the cash surrender value represents the value of the policy for gift tax purposes. Although the policy involved in the instant case is not a single premium policy, it had been fully paid up and we see no difference in principle between it and a single premium policy. Beckemeier in receiving this fully paid $25,000 life insurance policy received valuable rights other than merely the right to surrender the policy for cash. Clearly it was worth more to Beckemeier than its cash surrender *197 value. The respondent has determined that the fair market value of the policy was $21,639.25. There is no evidence in the record to show error in this determination, and we accordingly approve the respondent's inclusion of the policy in the computation of gain at that figure. Decisions will be entered for the respondent. Footnotes
1. This was done pursuant to the requirements of the statutes of Missouri. See sections 351.390 and 351.195 Vernon's Annotated Missouri Statutes and annotations, including Botz v. Helvering ( C.A. 8) 134 F. 2d 538↩. 2. e taxable year here involved is 1954. However, section 391 and section 392 of the Internal Revenue Code of 1954 provide that part I and part II of subchapter C, which relate to distributions in redemption of stock and to partial liquidations, are not effective until June 22, 1954. Under section 395 of the 1954 Code, in considering whether the transaction was a partial liquidation, we are concerned with section 115(i) of the Internal Revenue Code of 1939, which provides as follows: (i) Definition of Partial Liquidation. - As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.