ROY E. FORD AND BONNIE J. FORD, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 64910. Filed October 22, 1958.

*Lad V. Tesar, Esq.*, for the petitioners.
*Arthur B. Bleecher, Esq.*, for the respondent.

OPINION.

BLACK, *Judge:* As has been stated in our preliminary statement, the principal part of the deficiency which the Commissioner has determined against petitioners for the year 1952 is due to his disallowance of a claimed net operating loss carryback by petitioners from the taxable year 1953.

Petitioners assigned error as to the disallowance by the Commissioner of the net operating loss carryback from 1953 which petitioners claimed for the year 1952. At the hearing petitioners moved to amend their petition so as to allege that the sale of the restaurant equipment by Ford to Wrinkle occurred in January 1954 and, therefore, his loss from the sale occurred in that year and he erred in reporting the loss in 1953 and in making his application for a net loss carryback from that year. At the hearing petitioners were granted permission to orally amend their petition but were directed to reduce the amendment to writing and file it as required by Rule 17 of the Rules of Practice of the Tax Court. Petitioners were given until April 15, 1958, in which to file their amendment in writing. They have never filed it. Our Court has held that an oral motion to amend the petition made at the trial and granted but never reduced to writing and filed does not serve to raise an issue. *Louis Halle*, 7 T. C. 245, affirmed without discussion of this point 175 F. 2d 500, certiorari denied 338 U. S. 949. See also *M. C. Parrish & Co.*, 3 T. C. 119, affirmed without discussion of this point 147 F. 2d 284. But even if we assume for the purposes of this case that petitioner, by his oral amendment to his petition at the trial, has properly raised the issue that his sale of the restaurant equipment to Wrinkle occurred in January 1954 instead of 1953, as petitioner reported in the return for that year and alleged in the original petition, we would still have to find on the facts that petitioner has not sustained his burden of proof on the issue.

It is true that petitioner has proved that Wrinkle did not actually pay Ford for the restaurant equipment until January 22, 1954. But after a careful consideration of all the evidence we are convinced that the sale to Wrinkle definitely took place not later than December 31, 1953. Therefore, petitioner's loss was incurred in 1953 as petitioner recorded it on his books and records, and is governed by the statutes which prevailed on that date.

We think that it is proper to point out that there seems to be no controversy but that petitioner incurred the loss which he claims in

such sale. The question is, did this result in a net operating loss which can be carried back and used as a deduction against 1952 net income as petitioner contends, or was the Commissioner correct in his determination that petitioner did not have a net operating loss in 1953 and consequently has no net operating loss deduction for the year 1952?

The Commissioner in his determination relies upon section 122 (d) (5), I. R. C. 1939.[1] It is proper here to point out that there was a change in the 1954 Code respecting net operating losses and their carryback. The Commissioner concedes that by virtue of this change in the law, if the sale by petitioner to Wrinkle had occurred in 1954 instead of 1953, the provisions of the 1954 Code would be applicable and petitioner would be entitled to the net operating loss deduction carryback to 1952 which he claims. However, due to the fact that we have found and held that the sale in question occurred on December 31, 1953, and that the loss on the sale of the equipment was incurred on that date, the provisions of the Internal Revenue Code of 1939 are applicable.

As we have already stated, there is no dispute between the parties that when petitioner sold the restaurant equipment and leasehold to Wrinkle he had a very substantial loss. Also, the amount of that loss is not in dispute. The dispute is as to whether the loss was a "net operating loss" within the meaning of the applicable statute which could be carried back to petitioner's taxable year 1952 and used as a deduction for that year. The Commissioner originally tentatively allowed petitioner's application for carryback and refunded $2,553.96 as the result of carrying back the 1953 loss to 1952. But, as has already been explained, the Commissioner on further investigation determined that the loss could not be carried back because it was not a "net operating loss" within the meaning of the applicable statute and regulations, and determined a deficiency. We think the Commissioner must be sustained.

The business of petitioner regularly carried on by him was that of home and residential building, as well as remodeling work. As shown in our Findings of Fact, in 1952 petitioner did some street

---

[1] SEC. 122. NET OPERATING LOSS DEDUCTION.

(a) DEFINITION OF NET OPERATING LOSS.—As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d).

\*      \*      \*      \*      \*      \*      \*

(d) EXCEPTIONS, ADDITIONS, AND LIMITATIONS.— \* \* \*

\*      \*      \*      \*      \*      \*      \*

(5) Deductions otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall (in the case of a taxpayer other than a corporation) be allowed only to the extent of the amount of the gross income not derived from such trade or business. For the purposes of this paragraph deductions and gross income shall be computed with the exceptions, additions, and limitations specified in paragraphs (1) to (4) of this subsection. \* \* \*

improving adjacent to some lots which he owned and which he intended to use in his house construction work. An individual by the name of Schultz owned property on the other side of the street and it was agreed that Ford would do street improvements adjacent to Schultz' property, as well as adjacent to his own, for which Schultz was to pay him. When petitioner had completed the work, Schultz was unable to pay him in cash and petitioner took in payment restaurant equipment and a leasehold valued at $6,000; at least that is the price which petitioner allowed Schultz in payment. Thus, the restaurant equipment and leasehold were acquired to extinguish a debt which arose out of Ford's home construction activity. If Ford had sold this restaurant equipment and leasehold which he had acquired from Schultz at a loss, it might well be that such loss could properly be included in determining a net operating loss incurred in Ford's regular business of house construction, remodeling, etc. But Ford did not do that; on the contrary, he improved the leasehold interest by purchasing and installing new restaurant fixtures and equipment and made certain other improvements at a cost to him of around $20,000. Thereupon, he made some kind of arrangement with Montgomery by which Montgomery was to operate the restaurant and pay petitioner 50 per cent of the profits. But there were no profits, at least petitioner never received any and in May 1953, the arrangement with Montgomery was terminated and Ford again came into possession of the restaurant property. Soon thereafter he leased it to Mike Wrinkle. This agreement between Ford and Wrinkle reads as follows:

*May 18, 1953*

This agreement entered into between Roy E. Ford and Mike Wrinkle.

Mike Wrinkle agrees to operate cafe at 11 So. Main as Manager & Owner and pay to Roy E. Ford 10% of all sales from cafe at 11 So. Main, now known as Mike's Cafe, for the lease of all equipment & fixtures in cafe. Ford to pay rent out of 10% paid him by Mike Wrinkle. Mike Wrinkle to pay all utilities and other costs. Mike Wrinkle in no way obligates himself to any previous Debts, Outstanding Bills or agreements of any kind made by former Owner, Ben Montgomery.

At the end of the year, not later than December 31, 1953, Ford sold all the equipment, fixtures, and leasehold of the restaurant to Wrinkle for $3,000 and incurred a loss of $21,389.56; the joint return for that year showed a net loss from all sources of $20,979.80. As we have already stated, petitioner contends that his loss from the sale of the restaurant equipment, fixtures, and leasehold to Wrinkle was an operating loss and that he is entitled to carry back to the year 1952 the net operating loss which he claims. We think this claim must be denied on the authority of such cases as *Joseph Sic*, 10 T. C. 1096, affd. 177 F. 2d 469, certiorari denied 339 U. S. 913; *Hartwig N. Baruch*, 11 T. C. 96, affd. 178 F. 2d 402; *Joe B. Luton*, 18 T. C. 1153;

*Appleby* v. *United States*, 116 F. Supp. 410. In *Appleby* v. *United States*, in denying the taxpayers a carryback net operating loss, the Court of Claims said:

In view of the purpose of the "net operating loss" deduction as indicated by the legislative history and judicial constructions of the provision, we are inclined to the view that to be exempt from the application of Section 122 (d) (5) a loss must be, not merely an incident to prudent management, but incurred in the *normal* day to day *operation* of the enterprise. This position is warranted by both the language and intent of the statute and is consistent with prior judicial pronouncements.

Again the Court of Claims, near the end of its opinion in the *Appleby* case, said:

As pointed out above, we regard the carry-back provision as designed to average only the income and losses resulting from the normal *operation* of a business and not as a general equalizer for occasional losses merely incident to prudent management of a business enterprise in all its aspects. * * *

On this issue, we sustain respondent. Inasmuch as the petitioners do not contest the only other adjustment made by the Commissioner in his determination of the deficiency,

*Decision will be entered for the respondent.*