The Farmers Union Corporation v. Commissioner.
Farmers Union Corp. v. Commissioner
Docket No. 69647.
United States Tax Court
T.C. Memo 1960-179; 1960 Tax Ct. Memo LEXIS 115; 19 T.C.M. (CCH) 941; T.C.M. (RIA) 60179; August 31, 1960
*115 Petitioner's business comprised the ownership and management of a piece of real estate from which it received rents, and the operation of a retail hardware store the gross receipts of which were substantially more than rent receipts. The store was in the building owned by petitioner. Petitioner's outstanding stock was 20,000 shares of common, $10 par value, $200,000. Two stockholders held 71 per cent of the stock. In 1951, petitioner's directors and stockholders adopted a plan to transfer all of the assets of the hardware business to such stockholders as elected to surrender 8,000 shares of stock. The purpose of the plan was to separate the mercantile business from the real estate business which petitioner was to continue. A few stockholders surrendered the required shares of stock; petitioner discontinued its conduct of the hardware business June 30, 1951. The 2 stockholders who held most of petitioner's stock were the ones who surrendered the major part of the 8,000 shares. They formed a partnership with the others who surrendered stock. As of July 1, 1951, the partnership leased the store premises from petitioner and continued the conduct of the business. Petitioner's capital *116 was reduced to 12,000 shares, $120,000. In its 1951 return petitioner omitted from inventory on June 30 the hardware assets transferred for stock, with a resulting operating loss. It did not report any transaction involving its receipt of 8,000 shares of stock. It deducted for 1952 and 1953 net operating loss carryovers from 1951. Held: (1) The respondent properly included in the cost of goods sold the hardware store inventory on hand June 30. Petitioner realized income from its operation of the hardware business and net income from all business in 1951. (2) Petitioner distributed the hardware assets in a partial liquidation in redemption of 8,000 shares of stock within section 115(c), from which no gain or loss could be realized. (3) The distribution of the assets could not give rise to a net operating loss, and, otherwise, there was no net operating loss which could be carried over to later years. (4) Petitioner failed to prove that expenses which related to the distribution plan were deductible business expenses under sec. 23(a)(1)(A). Ralph A. Yeo, Esq., 3404 Fernwood Street, San Mateo, *118 Calif., for the petitioner. Aaron S. Resnik, Esq., and Godfrey Munter, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner determined income tax deficiencies for the taxable years 1951, 1952, and 1953 in the respective amounts of $22,309.36, $4,830.95, and $7,676.72. The chief issue is whether a transfer by petitioner in 1951 of all of the assets of its hardware business in exchange for 8,000 shares of petitioner's stock was a sale for stock, or a distribution in partial liquidation under section 115(c), 1939 Code, in redemption of the stock. The petitioner contends that it sold the assets at a loss. A related question is whether petitioner had a net operating loss in 1951 which can be carried over to 1952 and 1953 under section 122(b)(2)(B). The second issue is whether expenditures of $450 in 1951 and $1,650.50 in 1952 for accounting, escrow, and legal fees are deductible business expenses under section 23(a)(1)(A). Findings of Fact The petitioner files its returns for the taxable years with the district director of internal revenue for the first district of California located in San Francisco. The petitioner keeps its *119 books and files its returns on the basis of calendar years and an accrual method of accounting. The petitioner is a California corporation which was organized on May 19, 1874. Its place of business has been and is at 151 West Santa Clara Street, San Jose, California. It is referred to hereinafter as Farmers Union. Under its articles of incorporation, the petitioner is authorized to establish and operate stores and warehouses, buy and sell merchandise, machinery, and agricultural implements and products, borrow and loan money, and conduct a general commercial and mercantile business. The petitioner has carried on business in San Jose, in the downtown section, continuously since 1874. The primary business of the petitioner, several years before the years involved here was the operation of a general, retail mercantile store which had several departments in which there were sold groceries, meats, household wares, paints, gardening tools, plumbing supplies, and builders' hardware. The store was a general country store. Petitioner owns the land and building where its business is conducted and some other real estate. The Farmers Union building is a 3-story building. The store occupied *120 the ground floor. The upper part of the building was leased as a small hotel. In 1951 petitioner received $13,800 rent for the space rented to the hotel operator. During the early years of petitioner's mercantile business, San Jose was a small community which served farmers and fruit growers in the Santa Clara Valley, and petitioner's customers were largely the farmers and country people in the area. As San Jose grew into a substantial city where general commercial and industrial businesses became established and the community changed and developed, petitioner's business went through various changes and competition increased. By about 1940, the operation of certain departments in petitioner's store had become unprofitable. The grocery and meat departments were closed and the business became chiefly a hardware business. In 1951, the petitioner transferred its mercantile and hardware assets and business, but it continued to own the building (which had been rebuilt in 1930), and it rented all of the space to tenants. It leased the store to a partnership. The authorized and outstanding stock of the petitioner as of January 1, 1951, and prior thereto, was $200,000, which consisted *121 of 20,000 shares of common stock having a par value of $10 per share. All of the stock was held by 134 stockholders as of June 15, 1951. During the years which are material, the president of the petitioner was John P. McEnery, and its secretary was David C. Kirby. McEnery became president in about 1947 and he held that office until 1952. In 1955, he became the secretary. In 1951, the directors of the petitioner corporation were McEnery, George Singletary, Louis A. Rossi, and Kirby. As of June 15, 1951, most of the 134 stockholders held stock in small lots of from 3 shares to less than 100 shares, each. Those who owned 100 shares, or more, were as follows: Stockholders
Shares
1. Carrie A. Barker
251
2. W. C. Bailey
129
3. Robert F. Benson
8,017
4. Emma Cerutti
105
5. L. A. Fitts
400
6. David C. Kirby
477
7. Phillip Lansdale
600
8. S. and M. Le Deit
150
9. John P. McEnery
6,236
10. Mayme Roper
406
11. J. Saunders
175
12. George Singletary
133
Among the smaller stockholders were the following who owned the number of shares designated: Alden French, 25 shares; Margaret O. D. Haworth, 25 shares; C. E. Righter, 28 shares; and Herbert S. Stark, *122 28 shares. Benson and McEnery owned the majority of the common stock of the petitioner, 14,253 shares, as follows: Robert F. Benson
8,017 shares
John P. McEnery
6,236 shares
14,253 shares The balance of the stock, 5,747 shares, was held by about 132 stockholders. As of June 15, 1951, the combined stockholding of McEnery and Benson constituted 71 per cent of the outstanding stock of petitioner. McEnery owned, individually, 31 per cent of the outstanding stock, and Benson owned 40 per cent. Prior to 1951, the directors of the petitioner paid a good deal of attention to a continuing problem of high inventories in the mercantile business which reflected a slowing down of sales of certain items. From time to time certain types of merchandise which were not selling quickly or profitably were discontinued. The directors instructed the manager of the store to increase his efforts to sell larger quantities of merchandise and to reduce inventories of unprofitable lines of goods. In about 1945 and thereafter, petitioner's president gave consideration to the possibility of selling petitioner's mercantile business but petitioner never received and its directors never *123 considered any specific offer of anyone to purchase the business. At a regular meeting of the directors on August 17, 1950, Benson proposed that consideration be given to the feasibility of separating the petitioner into 2 corporations, one to hold and operate the real estate and the other to carry on the mercantile business. The directors authorized petitioner's attorney, who was the secretary, to study the matter and to look into the tax and accounting aspects of the proposal. On September 18, 1950, at a director's meeting, the attorney gave a report on the proposal to divide petitioner into 2 corporations and he advised the directors that he had asked the collector of internal revenue for information about the tax aspects. At a meeting of the directors on November 13, 1950, the directors decided to submit the proposal to the stockholders for their approval. The then contemplated plan involved the organization of a new corporation to be called The Farmers Union Building Corporation. On November 13, 1950, at a special meeting of the stockholders, a printed outline of the proposed division of petitioner into 2 corporations was distributed and a resolution was adopted authorizing *124 the directors to form a new corporation as of January 2, 1951, to which the real estate owned by petitioner would be transferred in exchange for all of its stock, 20,000 shares having a par value of $10 per share, which stock would be distributed on a 1 for 1 basis to all of petitioner's stockholders. Although the above action was taken by the stockholders on November 13, 1950, for some unexplained reason the plan to form a new corporation and to separate the real estate assets from the mercantile and hardware business was abandoned. However, further consideration was given to the general proposal and at a monthly meeting of the directors on May 17, 1951, petitioner's president submitted to the directors a plan for the segregation of the business of petitioner which consisted of owning and operating its real estate from its mercantile business "by means of a sale of some of the assets of the corporation to the stockholders in exchange for the capital stock." Petitioner's secretary and attorney, Kirby, was authorized to proceed with such plan and to prepare a resolution for submission to the directors and stockholders. At the same meeting a resolution was adopted declaring a dividend *125 payable June 30, 1951, of 40 cents per share, or $8,000. At a special meeting of the directors on May 22, 1951, a resolution was adopted approving a plan whereby petitioner would offer to its stockholders the opportunity to exchange for 8,000 shares of petitioner's stock all of the assets used in and constituting its mercantile and hardware business, subject to designated liabilities. The plan provided inter alia that in the event the stockholders approved the proposal, petitioner would give a 20 year lease to the transferees of the assets of the ground floor of the building at an annual rent of $18,000. The plan provided, further, that the lease would permit the subsequent sale of the mercantile business by the transferees and the consequent assignment of the lease to a vendee. Also, the plan provided that "Any stockholder who does not indicate his election to either exchange his stock for his pro rate interest in the merchandising business or to have his stock remain as presently issued and outstanding will be presumed to elect to have his stock remain as presently issued and outstanding." A special meeting of stockholders was held on June 7, 1951. The minutes of the meeting *126 state, in part, as follows: "The President announced that the sole purpose for the meeting was the discussion of the proposed method of partial liquidation of the corporation's assets by distributing the merchandising business to stockholders in exchange for 8,000 shares of stock. * * *." The stockholders adopted a resolution which approved the plan "to effect a division and segregation of the operation, management and maintenance of the real properties of the corporation from the ownership, operation, management and control of the merchandising business of the corporation." All of petitioner's stockholders were given notice of the special stockholders' meeting of June 7, 1951, a copy of the resolution adopted by the directors, containing the plan, and a printed election form. The election form bore the following: "I, or we, the undersigned owners of shares of stock of The Farmers Union, a California corporation, hereby elect to surrender shares of said capital stock to said corporation in exchange for eight-thousanths interest in the assets of the corporation proposed to be transferred to the stockholders pursuant to resolution of the Board of Directors of The Farmers Union, *127 regularly adopted on Tuesday, May 22, 1951. "I, or we, desire to leave shares of stock of The Farmers Union as presently issued and outstanding in my (our) name (s)." The plan required that stockholders make their decision not later than June 14, 1951. There was attached to the notice to the stockholders of the special meeting a balance sheet showing the assets which were to be transferred in exchange for stock and the assets to be retained by petitioner if the stockholders approved the plan. Petitioner's accountant prepared the statement from petitioner's books. He was told that the plan was to sell the mercantile business assets and he used that word in the statement. The stockholders were accordingly advised about which assets might be exchanged for stock. The dollar amounts in the statement were the amounts at which the assets and liabilities were carried on petitioner's books, i.e., cost or cost less depreciation. The statement sent to the stockholders prior to June 7, 1951, was substantially the same as the statement set forth below which was prepared by the accountant in July, as of June 30, 1951 The following statement shows dividend, paid June 30, to stockholders of *128 record June 15, 1951: Assets
To Be Sold
To Be Retained
Cash
$ 12,280.18
$ 11,133.99
$ 1,146.19
Notes & Accounts
82,743.07
82,743.07
Inventory
284,138.79
284,138.79
Fixtures
20,916.85
20,916.85
Trucks
3,852.40
3,852.40
Prepaid Bldg. & Store
6,453.05
3,981.63
2,471.42
Deposits
1,950.00
1,950.00
Land
111,925.67
111,925.67
Buildings
92,791.57
92,791.57
$617,051.58
$408,716.73
$208,334.85
Liabilities
Accts. Payable, & Taxes
$ 33,516.89
$ 33,516.89
$ 0
Note Payable
70,000.00
70,000.00
0
$103,516.89
$103,516.89
0
Capital
$200,000.00
Surplus
290,985.41
Earnings
30,549.28
$521,534.69
Less Dividends
8,000.00
$513,534.69
$617,051.58
8,000 shares
12,000 shares
The California Pacific Title Insurance Company in San Jose was designated escrow agent to receive stock certificates from those who elected to surrender stock under the plan, and an escrow was opened on July 2, 1951. While the escrow was pending, L. A. Fitts transferred her 400 shares of stock to Jane Sherburne; McEnery acquired from other stockholders 727 shares, which increased his holdings to 6,963 shares; and Benson acquired 214 *129 additional shares, which increased his total shares to 8,231. McEnery then held 34.3 per cent of petitioner's 20,000 shares of outstanding stock; Benson then held 41.1 per cent; and their combined holdings were 75.4 per cent. Ultimately, by about October 1, 1951, 7 of petitioner's 134 stockholders agreed to surrender all or some of their stock in exchange for the hardware business assets. They surrendered 8,000 shares. In this group, 4 surrendered all of their stock so that the number of petitioner's stockholders was reduced to 130. The other 3 stockholders surrendered part of their stock. The following shows the stockholders who decided to surrender stock in exchange for some of petitioner's assets, the number of shares deposited in the escrow, and the number of shares retained: Shares
Shares
Stockholder
Surrendered
Retained
R. F. Benson
3,753
4,478
John McEnery
3,754
3,209
Alden French
12
13
Jane Sherburne
400
0
C. E. Righter
28
0
H. S. Stark
28
0
M. Haworth
25
0
8,000
The remaining 12,000 shares of petitioner's stock was held after the escrow was closed in the following proportions: Benson's retained shares (4,478) represented *130 37.3 per cent; McEnery's retained shares (3,209) represented 26.7 per cent; and the rest of the stock retained by 128 stockholders represented about 36 per cent. The combined holdings of Benson and McEnery constituted 64 per cent of the remaining 12,000 shares. The plan of petitioner's directors for the "division and segregation" of the operation of the real properties of petitioner from the ownership and operation of the merchandising business of petitioner which was approved and adopted by the stockholders on June 7, 1951, listed the categories of assets which were primarily used in the merchandising business (such as accounts receivable, merchandise inventory, autos and trucks, furniture and fixtures, and prepaid items) which were to be transferred to stockholders in exchange for 8,000 shares of stock, and the plan also listed the types of liabilities which the transferees were to agree to assume, but nowhere in the plan was there stated the value of all or any item of the assets to be transferred or the amount of any liability which was to be assumed except that a note of petitioner payable to the Bank of America in the amount of $70,000 was stated as a specific liability to *131 be assumed. In other words, no total value of the assets to be transferred and no total amount of the liabilities to be assumed by the transferees in exchange for 8,000 shares of stock was stated in the plan. The plan provided only that, in general, all of the assets used in the merchandising (hardware) business, subject to liabilities, were to be transferred to those who surrendered 8,000 shares of stock, and that for each share of stock surrendered each person entering into the transaction would receive a one eight-thousandths interest in the transferred assets. The transfer of the hardware store assets and business was effected through and handled by the escrow agent. It received directions for handling the transfer from Kirby, petitioner's attorney, acting for petitioner as its secretary, by a letter dated October 23, 1951, which specified that the following steps were to be taken by the agent: Kirby forwarded to the escrow agent with the instructions letter the lease in triplicate from petitioner to Farmers Union Hardware Company, a co-partnership, and a bill of sale from petitioner to the partnership. The escrow agent was directed to record the lease; pay petitioner $18,000, *132 the rent for the last year under the lease; and to deliver to petitioner 8,000 shares of stock in petitioner. Upon compliance with the above, the agent was then authorized to deliver the bill of sale to the partnership. The agent, on October 24, 1951, delivered to petitioner the money, the stock, and a copy of the recorded lease and thereupon delivered the bill of sale to the partnership. The hardware store assets were not transferred by petitioner until of group of petitioner's stockholders formed a partnership to carry on the hardware store business. In this group, McEnery and Benson had the controlling interest. The transfer arrangements were not completed until October 24, 1951, although it was made effective as of July 1, 1951. The transfer of the assets was not made to the group of stockholders until after they had executed a partnership agreement to carry on the hardware business. That agreement was executed in October, a few days before October 24, 1951. On October 19, 1951, a partnership agreement was executed by the 7 individuals who had deposited stock in escrow (Benson, McEnery, French, Sherburne, Righter, Stark, and Haworth) whereby the parties formed a partnership *133 for an indefinite length of time to carry on a general mercantile business under the name of The Farmers Union Hardware Company. The agreement recites that each party had surrendered to Farmers Union a specific number of shares of stock in Farmers Union, the total aggregating 8,000 shares, and that the respective interest of each party in the partnership was as follows: "* * *, the respective interests of the foregoing named persons in and to the partnership hereby formed and the respective contributions to the capital of said partnership of the foregoing named persons, is and shall be the ratio computed in percentage figures which the number [of shares] set opposite his name in the paragraph immediately hereinabove set forth shall bear to the total number of Eight Thousand (8,000) [shares];" The agreement also provides that the fiscal year of the partnership begins on July 1 of each year; that the place of business of the partnership is 151 West Santa Clara Street, San Jose; that the transfer of ownership of the mercantile business had been made as of July 1, 1951, and that the mercantile business had been carried on since that date under the name of The Farmers Union Hardware *134 Company. The partnership agreement does not contain a statement of any dollar amount of capital or assets contributed to the partnership by those entering into the agreement, or that assets in any dollar amount had been received by them and turned over to the partnership. The first Whereas clause of the agreement is an incomplete sentence in which some words were omitted. The omitted words relate to the merchandising business of Farmers Union. The first clause of the partnership agreement is as follows: "WHEREAS, the parties hereto have, concurrently with the execution of this partnership agreement, surrendered to The Farmers Union, a California corporation, an aggregate total of Eight Thousand (8,000) shares of the common capital stock of said corporation, the merchandising business of said corporation, conducted at 151 West Santa Clara Street, San Jose, California, including all furniture, fixtures and equipment, inventory of merchandise and supplies, accounts receivable, good-will of said business and all other assets of The Farmers Union, a California corporation, used in the operation of said merchandising business excluding the land and buildings belonging to said corporation; *135 " The entire partnership agreement is incorporated herein by this reference. A bill of sale, dated October 19, 1951, of the petitioner was executed by its president, McEnery, and its secretary, Kirby. It was delivered to the escrow agent on October 23, 1951. The bill of sale recites that Farmers Union granted, sold, and conveyed to The Farmers Union Hardware Company, a copartnership consisting of the 7 above-named individuals, all of its interest in its accounts receivable, merchandise inventory, motor vehicles, prepaid items, and furniture and fixtures located at 151 West Santa Clara Street, subject to accounts payable, taxes payable, a note of $70,000 to the Bank of America, and other liabilities computed as of the close of business of the merchandising establishment conducted by Farmers Union on June 30, 1951. Nowhere in the bill of sale is any amount stated as the total value of the transferred assets and the total amount of the liabilities to which the assets were subject. It is stated that the "consideration" for the bill of sale is the surrender to Farmers Union of 8,000 shares of stock standing in the names of the above-named 7 stockholders. In the bill of sale no value *136 is stated as the total value or the per share value of the 8,000 shares of stock. No statement of the items transferred and the values thereof, and of the liabilities assumed and the amounts thereof was attached to the bill of sale. It is incorporated herein by this reference. Petitioner and the members of the partnership entered into a 20-year lease of the premises where the hardware store had at all times and continued to be located (151 West Santa Clara Street) whereby that space in petitioner's building was leased to the partnership at an annual rental of $18,000 from July 1, 1951, to June 30, 1971, as was provided in the plan approved by petitioner's stockholders on June 7, 1951. The lease was delivered to the escrow agent on October 23, 1951, and was recorded by the agent. The 7 above-named stockholders of petitioner and members of the newly formed partnership paid $18,000 in the escrow in October, 1951, which represented the last year's rent under the lease from the petitioner to The Farmers Union Hardware Company, the partnership. On or about October 24, 1951, the escrow at California Pacific Title Insurance Company was closed. The escrow agent delivered the bill of *137 sale to the partnership and then turned over to petitioner the 8,000 shares of stock which had been deposited by the 7 stockholders and the $18,000 in rent received from the partnership. At a regular meeting of petitioner's directors on August 16, 1951, petitioner's accountant called the director's attention to the fact that in a submitted financial statement he had reduced the stated capital of petitioner from $200,000 to $120,000. The directors adopted a resolution reducing petitioner's stated capital to $120,000 represented by 12,000 shares of stock of a par value of $10 per share. The directors agreed, further, that petitioner's place of business would continue to be at 151 West Santa Clara Street. The matter of salaries was discussed and petitioner's president was requested to act without salary. The annual meeting of petitioner's stockholders was held on February 13, 1952. At this meeting it was reported by petitioner's secretary and attorney that the outstanding shares of stock of petitioner had been reduced from 20,000 to 12,000 shares. The stockholders adopted a resolution reducing the stated capital of petitioner from $200,000 to $120,000, which represented the then outstanding *138 shares of stock, 12,000, having a par value of $10 per share. All of the acts of the directors during 1951 were ratified and approved by the stockholders. The Farmers Union Hardware Company (the partnership) has carried on the mercantile business continuously from the time the petitioner transferred the assets and business to it in 1951 up to the present time. However, by August, 1954, McEnery purchased the interests in the partnership of Sherburne, Righter, Stark, and Haworth so that since then there have been only 3 partners. The interests of the original 7 partners in the property of the partnership, based upon the net book value of the assets transferred by petitioner and the ratio of the stock of petitioner which each surrendered were as follows: Partner
Interest
Book Value
McEnery
3,753/8,000
$143,754.67
Benson
3,754/8,000
143,716.37
Sherburne
400/8,000
15,317.49
Righter
28/8,000
1,072.22
Stark
28/8,000
1,072.22
Haworth
25/8,000
957.34
French
12/8,000
459.53
$306,349.84
Before petitioner transferred its mercantile assets and business to the 7 stockholders and after the transfer, when the business was conducted by the partnership, *139 McEnery was the most active person in the management of the mercantile business. In its return for 1951, the petitioner did not report any transaction involving a sale of its assets, or a purchase of any of its own stock. Accordingly, petitioner did not report, as a transaction, any loss from the sale of any assets. However, in the balance sheet, schedule L, in the return, petitioner showed a reduction in capital stock from $200,000 to $120,000; a reduction in surplus and undivided profits from $290,985.41 to $88,182.34; no inventory on hand at the end of the year; a reduction in depreciable assets from $132,348.75 to $93,313.95; and other adjustments. In connection with the exchange in 1951 of assets for stock, the petitioner expended for legal and accounting fees $450 in 1951, and $1,650.50 in 1952, which were deducted as business expenses in the returns for those years. Respondent disallowed the deductions. He determined that such expenditures in each year were nondeductible capital expenses. The petitioner did not include in rents received in 1951, the $18,000 received from The Farmers Union Hardware Company in 1951 under the lease. The respondent included that amount in *140 petitioner's income for 1951. In its return for 1951, petitioner reported (line 3) a loss from sales in the amount of $217,527.20, as follows: Gross sales
$363,709.33
Less: Cost of goods sold
581,236.53
Loss from sales
$217,527.20 Petitioner reported cost of goods sold (schedule A) as follows: Inventory at beginning of year
$228,244.57
Merchandise bought for sale
291,295.24
Salaries and wages
61,696.72
$581,236.53
Less: Inventory at end of year
0
Cost of goods sold
$581,236.53
For 1951, petitioner reported (line 34) a total loss of $246,952.11. In its returns for 1952 and 1953, petitioner reported net income of $16,544.54, and $26,982.20, respectively, before deductions for a net operating loss carried over from 1951. On each return it carried over a net operating loss from 1951 in the respective amounts of $16,544.54, and $26,982.20. No income was reported, therefore, for 1952 and 1953. The respondent determined that petitioner did not sustain a loss in 1951 and, accordingly, he disallowed the carryovers of net operating loss from 1951 to 1952 and 1953 which petitioner deducted. The Farmers Union Hardware Company, the partnership, *141 filed a partnership return for the fiscal year July 1, 1951 to June 30, 1952. In its return it reported gross receipts of $687,293.70, and gross profit from sales of $233,876.92. It reported net income of $12,797.46. In computing its cost of goods sold, the partnership reported inventory at the beginning of its fiscal year of $283,298.88. This represented the inventory transferred to the partnership by petitioner in the transaction involving the exchange of assets for 8,000 shares of petitioner's stock. In its partnership return, the partnership included a typed schedule of the capital accounts of its 7 partners. The total amount of the capital accounts as of July 1, 1951, was stated to be $306,349.84. In determining the deficiency for 1951, the respondent determined that the petitioner had omitted from its 1951 return merchandise inventory on hand as of June 30, 1951, in the amount of $283,298.88, which is the amount of inventory on July 1, 1951, which was reported by the partnership in its return. The respondent determined further that the inclusion of the above amount of inventory in petitioner's 1951 income resulted in net income from business operations of $36,346.77, as follows: *142 Net loss per return
[246,952.11)
Merchandise inventory 6/30/51
omitted
283,298.88
Net income corrected (per
books)
$ 36,346.77 The respondent gave in the statement attached to the deficiency notice the following explanation: "The ending inventory of the portion of your operations as of June 30, 1951 was omitted from the computation of the net loss shown on your return for the year ended December 31, 1951. "As of June 30, 1951, you redeemed 8,000 shares of your stock for the net assets of your store portion of your corporation. The inventory at June 30, 1951 was a part of these net assets the stockholders who received the store net assets for their 8,000 shares of stock, transferred the net assets to a newly formed partnership, The Farmers Union, at book value to the corporation. After June 30, 1951, your corporation retained the remaining assets, such as land and buildings. "On the books of your corporation, you treated the redemption of the 8,000 shares of your stock as a loss on the sale of a part of your assets, computed as follows: Net book value of assets
$306,349.84
Par value of 8,000 shares
80,000.00
Loss
$226,349.84
"Your *143 surplus account transactions, per books, for the year ended December 31, 1951 were as follows: Surplus, per books, January 31,
1951
$290,985.41
Less: Dividends paid
$ 12,800.00
Loss on redemp-
tion of stock
226,349.84
239,149.84
Remainder
$ 51,835.57
Net profit per books for the
year ended December 31, 1951
36,346.77
Surplus, per books, December
31, 1951
$ 88,182.34
"Determination has been made that the ending inventory at June 30, 1951 for $283,298.88 was an increase in income. Also, it was held that you did not sustain a loss on the sale of certain of net assets, as the transaction was a partial liquidation and no gain or loss was realized by you from the mere distribution of your assets in kind, in partial liquidation." Ultimate Findings of Fact The sum of $18,000 received by petitioner in 1951 from the partnership under the lease of the store premises was income to petitioner in 1951. During the first 6 months of 1951, petitioner realized gross profit from sales in the operation of the hardware business in the amount of $65,771.68, rather than a loss of $217,527.20. The expenditure in 1951 of $450 for expenses incident to the *144 transfer of the hardware assets was not an ordinary and necessary expense of carrying on petitioner's business. Petitioner realized net income in 1951 in the amount of $54,796.77. The net book value of the assets distributed as of July 1, 1951, was $306,349.84. The real nature and the net effect of the transaction involving the hardware assets was a distribution in kind in partial liquidation in redemption of 8,000 shares of stock; it did not constitute a sale of the assets for stock. Petitioner's business operations were substantially reduced by the distribution of the assets involved. Petitioner did not sustain a loss from the transaction. The expenses paid in 1952 for accounting, escrow, and legal charges, which were incident to the 1951 transfer of assets, were not ordinary and necessary expenses of carrying on petitioner's business. Petitioner improperly deducted from its net income for 1952 and 1953, as the carryover of an alleged net operating loss in 1951, the amounts of $16,544.54, and $26,982.20, respectively. Opinion HARRON, Judge: The chief question for decision is whether the assets used in petitioner's hardware business were transferred in 1951 by petitioner *145 in redemption of 8,000 shares of stock, in a partial liquidation, within the meaning of section 115(i), 1939 Code, or whether petitioner sold the assets for stock. The last question is whether certain expenses which were incident to the transaction and were paid in 1951 and 1952 were or were not ordinary and necessary business expenses, deductible under section 23(a)(1)(A). Petitioner contends that it sold the hardware business assets and, also, that they were sold at a loss. The years 1952 and 1953 are involved because petitioner alleged in petition that the respondent erred in disallowing deductions taken for 1952 and 1953 for net operating loss carried over from 1951. For convenience, this issue is disposed of first. Net Operating Loss Carryover to 1952 and 1953 As a preliminary matter we need to consider whether the respondent erred in determining that certain merchandise inventory was improperly omitted from petitioner's return for 1951, and that petitioner realized gross profit from 1951 sales rather than a loss of $217,527.20, as is alleged in the petition. Petitioner has not expressly stated that it no longer contests that determination. Petitioner now states that it *146 "makes no claim that its income tax return [for 1951] conformed with all the technical requirements regarding the method of reporting the loss [alleged to have resulted from the purported sales of assets]." Since petitioner seems to maintain that it is entitled to carry over loss to 1952 and 1953, it is necessary to point out which type of loss may be carried over from 1951, as a matter of law, and which loss may not be carried over. Under established rules, a distinction must be made between a loss from the operation of a business in one taxable year, which business is continued by the same taxpayer in subsequent years, and a loss from the discontinuance of a business. See Dalton v. Bowers, 287 U.S. 404; Libson Shops v. Koehler, 353 U.S. 382, 388; Gene Cluck, 29 T.C. 7, 10, affd. 261 F. 2d 267, certiorari denied 359 U.S. 945; Lazier v. United States, 170 F. 2d 521, 526. With respect to petitioner's business: Its income in 1951 was derived from three sources, - the operation of its hardware store for 6 months; rent received from the lease of the upper part of its building, rent charged to the hardware *147 store as a cost of such business while petitioner operated that business, and rent received from the partnership which leased the store premises as of July 1, 1951; and discounts and interest. Petitioner now agrees that the total net rent includible in gross income for 1951 was $24,118.08. Its income from discounts and interest was $6,074.75. Income from these sources totalled $30,192.83. During the period January 1 through June 30, 1951, petitioner's gross sales in its hardware business amounted to $363,709.33. The accountant who prepared the 1951 return omitted from Schedule A, Cost of Goods Sold, inventory on hand in the hardware business on June 30. It was reported in the return that such inventory was zero. That was not true. Petitioner had inventory on hand in its hardware business on June 30, when its operation of that business ended, and the value thereof entered into the cost of goods sold up to July 1. The respondent determined that the inventory on hand on the above date amounted to $283,298.88. That is the amount of the inventory as of July 1, 1951, which the partnership, Farmers Union Hardware Company, reported in its partnership return. Petitioner has not established *148 that its inventory on June 30 was in any other amount. Therefore, it must be held that the respondent's determination in this respect is correct. It follows that the cost of good sold by petitioner through June 30 was $297,937,65 ($581,236.53 less $283,298.88). Therefore, petitioner had gross profits from sales in the amount of $65,771.68, rather than loss of $217,527.20, as reported; and it had total income from all sources of $95,964.51. Petitioner's total deductions in its return were $41,617.74, before respondent disallowed a deduction of $450 (which is disputed here). Petitioner's net income for 1951 was at least $54,346.77. The respondent correctly determined that petitioner improperly omitted from its cost of goods sold the inventory on hand on June 30 in the above-stated amount. Also, respondent correctly determined that petitioner did not have a net operating loss either from the operation of the mercantile business, or from all of its business. That is to say, the petitioner did not have a loss in 1951 of $246,952.11, the amount of loss reported on line 34 of its return. In its return for 1952 and for 1953, petitioner took a net operating loss deduction on line 33. The *149 deduction was taken under section 122(b)(2)(B), and it was stated in the attached explanation that petitioner had sustained in 1951 a net operating loss of $246,952.11. In each instance the net operating loss deduction wiped out net income. Respondent disallowed the net operating loss deductions. In its petition, the petitioner alleged that the respondent erred in disallowing those deductions; that it had a net operating loss in 1951 (no amount is stated); and that such loss was properly carried over to offset net earnings for 1952 and 1953. On brief, the petitioner relies upon the above allegation, but on a different ground. Petitioner's contention is vague, but we understand it to be that it sold the mercantile assets at a loss of at least $225,199.84, which amount petitioner apparently substitutes for the loss of $217,527.20, which it reported in its 1951 return on line 3 as loss from the operation of its mercantile business. Then, petitioner seems to arrive at a revised total loss for 1951 of about $236,624.75. It is petitioner's theory now that due to the claimed loss from the alleged sale of assets for stock, petitioner had a "net operating loss" in 1951 which it properly can *150 carry over. Petitioner did not report in its return for 1951, in any respect, the transaction involving the transfer of the assets used in its hardware store business for 8,000 shares of stock. Petitioner presented the issue involving that transaction for the first time in its petition where it alleged that the respondent erred in determining "that the receipt by petitioner in 1951 of 8,000 shares of its stock, in exchange for its inventory and other assets constituting its retail hardware business was a distribution of assets in kind, in a partial liquidation of the corporation." However, in the balance sheet which is part of the return (schedule L), petitioner stated that its common stock had been reduced in 1951 from 200,000 to 120,000 shares, and that its surplus had been reduced from $290,985.41 to $88,182.35. Otherwise, in its return, there is no explanation for the reduction in common stock by 8,000 shares. Also, with respect to the reported reduction in unearned surplus and undivided profits, it is stated in schedule M that there was an inventory loss, January 30 to June 30, 1951, of $56,949.04. This is not explained. Thus, the accountant who prepared petitioner's return *151 chose to give effect in schedules A, L, and M, to the transfer of the hardware store assets, but without explanation. It was not until the respondent determined the deficiency for 1951 that the petitioner, in its petition, made the claim that it had sold the inventory and other assets constituting its retail hardware business at a loss. Petitioner's theory is wrong. It must be concluded that the respondent properly disallowed a deduction for 1952 and for 1953 of a net operating loss carryover under section 122(b)(2)(B). In order now to dispose of the chief issue raised by the pleadings with respect to 1952 and 1953, we shall assume arguendo (but without deciding at this point whether or not the assets in question were sold, the question which will be decided hereinafter) that petitioner sold all the assets used in its mercantile business at a loss of in excess of $200,000. Even if that could be concluded (which we do not now decide), such loss did not represent a net operating loss within the definition contained in section 122(a), [1] under the rule which is well established. *152 When petitioner transferred its mercantile business assets for stock and the business was then carried on by the partnership, petitioner terminated the part of its general business which had produced the major part of its gross income. Petitioner's termination of its hardware business on June 30, 1951, (whether the transfer was made pursuant to a sale or a partial liquidation) constituted the reduction of a substantial part of its business. A loss (if any) from the disposition of the mercantile business was attributable to the ending of one important part of petitioner's business. Petitioner did not dispose of the assets in question in the conduct of the mercantile business. Rather, they were transferred because petitioner was not going to operate that business any more. Therefore, the loss, if any, was not a "net operating loss" within section 122(a), and petitioner cannot carry forward to 1952 and 1953 any part of such loss. This conclusion is supported by the following authorities: In Dlaton v. Bowers, supra, and more recently in Libson Shops v. Koehler, supra, the Supreme Court reviewed the legislative history of section 122 and the language of a similar earlier *153 provision, and concluded that the statute allowing the carrying back and carrying forward of "net operating loss" was intended by the Congress to give relief by permitting a taxpayer "to offset its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year." The Supreme Court pointed out that underlying such purpose was the requirement of continuity of a single business by the same taxpayer. In Gene Cluck, supra, this Court noted that the courts "have laid down a general rule that a sale of a part or all of the assets used in a trade or business regularly carried on is not attributable to the operation of that business if the sale was connected with the partial or total termination of the regular business rather than with the operation thereof." See, also: Joseph Sic, 10 T.C. 1096, affd. 177 F. 2d 469, certiorari denied 339 U.S. 913; Joe B. Luton, 18 T.C. 1153; Lazier v. United States, supra; Pettit v. Commissioner, 175 F. 2d 195; Appleby v. United States, 116 F. Supp. 410; and Roy E. Ford, 31 T.C. 119, 124. *154 Transfer of Assets for Stock The transfer of all of the hardware business assets for 8,000 shares of stock in 1951 gives rise to several questions: Were the assets sold for stock? If so, to whom was the sale made, individual stockholders or a partnership? Was the sale made at a loss? Or, were assets distributed in a partial liquidation under section 115(c) in redemption or cancellation of part of petitioner's stock, within the definition of a partial liquidation in section 115(i)? [2]
Petitioner's argument that there was a sale is based primarily on the application of section 29.22(a)-15 of Regulations 111. Respondent argues that the evidence does not support a finding that there was a sale, that the real nature of the transaction was a partial liquidation in redemption of stock, and that under section 29.22(a)-20 of Regulations 111, no *155 loss is realized from the distribution of assets in kind by a corporation in partial liquidation. The respondent has determined that the transaction was a partial liquidation from which no loss was sustained since there was a mere distribution of assets in redemption of stock. The petitioner has the burden of overcoming the prima facie correctness of the determination. We must determine the real nature and the net effect of the transaction involved. Cf., Commissioner v. Bedford's Estate, 325 U.S. 283; and Lencard Corporation, 47 B.T.A. 58. Upon careful consideration of the record, the statute, and the above regulations it is concluded that the transaction constituted not a sale of the assets, but a distribution in kind in partial liquidation, with no loss resulting therefrom. The transaction grew out of a plan submitted to petitioner's directors and stockholders. The plan, incorporated in the resolution adopted by the stockholders on June 7, 1951, expressly stated that the general purpose was to effect a separation of that part of petitioner's business which involved the ownership, maintenance, and management of real estate from the ownership and management *156 of the hardware and merchandising business theretofore carried on by petitioner. The plan was for a division and segregation of petitioner's assets. It was contemplated that the hardware business would be carried on by the transferees and the plan provided for petitioner's giving them a 20-year lease of the ground floor of its building where the hardware store was located. The plan was not drawn in terms of a purchase and sale and no selling price of the assets was stated, as was done in the contract involved in C. M. Menzies, Inc., 34 B.T.A. 163, 164. The plan stated that petitioner offered to exchange the assets used in the hardware business for 8,000 shares of stock, and that the stockholders who elected to enter into the plan would surrender stock in exchange for an undivided interest in the assets. The plan made no mention of the giving of a bill of sale by petitioner to convey the assets to those who surrendered stock. The minutes of the stockholders' meeting of June 7, 1951, at which the plan was adopted, states that petitioner's president announced that the purpose of the meeting was to discuss a "proposed method of partial liquidation of the corporation's assets *157 by distributing the merchandising business to stockholders in exchange for 8,000 shares of stock." It is true that at an earlier meeting of the directors on May 22, 1951, the president stated that the purpose of that meeting was to consider adopting a resolution "for the sale of the assets of the business * * * to stockholders in exchange for stock", but the resolution adopted incorporated the same plan as was adopted subsequently by the stockholders. In our opinion, such statement was overcome by the stockholders' resolution and the wording of the plan, both of which are entitled to greater weight. Although during the escrow, on October 19, 1951, petitioner executed a bill of sale and the escrow agent delivered that to the Farmers Union Hardware Company, the partnership formed to caarry on the hardware business, there is no evidence establishing that the bill of sale was recorded, or that a notice of intended sale was recorded, as was done in C. M. Menzies, Inc., supra; see page 165. Section 3440.1 of the Civil Code of California requires the recording 10 days before the consummation of a sale of stock in trade, other than in the ordinary course of business, of a notice *158 of intended sale which states the names of the intended vendor and vendee. Furthermore, under section 3440 there must be both recording of the bill of sale and notice and delivery; one without the other will not satisfy the statute. See Edgerton v. Scammon, 6 P. 2d 295. The transaction was completed when the escrow was closed on about October 24, 1951. Prior to that date, at a meeting on August 16, 1951, petitioner's directors adopted a resolution reducing petitioner's stated capital to $120,000, represented by 12,000 shares of stock. At the stockholders' meeting on February 13, 1952, the stockholders ratified all actions of the directors in 1951 and, also, adopted a similar resolution reducing petitioner's capital to $120,000. The action of the directors and approved by the stockholders in reducing petitioner's stated capital was in compliance with section 1904 of the Civil Code of California. Under section 1709, the directors could retire the stock surrendered for the assets. That is what was done in this instance. Petitioner's business operations were substantially contracted as a result of the distribution of the assets used in the hardware business. It cannot *159 be said that petitioner's business operations after the transaction were conducted on the same scale as before. Cf., Pacific Vegetable Oil Corp. v. Commissioner, 251 F. 2d 682. Afterward, its operations were limited to managing its real estate and collecting rents. Petitioner went out of the hardware business when the transaction was consummated. It distributed assets having a net book value of $306,349,84, and retained assets of a net book value of $208,334.85. It is noted that only 7 stockholders entered into the plan and that there was not a distribution among all of the stockholders, but the applicable statute does not require a distribution among all of the stockholders of a corporation as a prerequisite of a partial liquidation. See Lucius Pitkin, Inc., 13 T.C. 547. On all of the facts and circumstances, it is held that the distribution of the assets was made to the participating stockholders in partial liquidation in redemption of the surrendered stock, and that there was not a sale of the assets for stock. The facts of the transaction bring it within sections 115(c) and 115(i). Section 29.22(a) 20, Regulations 111 applies. The conclusion is not *160 otherwise when consideration is given to section 29.22(a)-15, Regulations 111, on which petitioner relies. Under the facts here, we do not think petitioner dealt in its own shares as it might have in the shares of another corporation; and we have concluded that it did not receive the shares as consideration for sale of the property involved. Petitioner's president, McEnery, testified that his interest in entering into the plan was to participate in getting hold of the hardware business because he wanted to operate that business. That objective could not have been carried out by petitioner's acquiring stock in some other corporation. It is our view that petitioner did not deal in its own stock in the same way as it would have done in the stock of another corporation. The provisions of section 29.22(a)-15, Regulations 111, are not helpful to petitioner. See Brockman Oil Well Cementing Co., 2 T.C. 168; Hill v. Commissioner, 126 F. 2d 570; and Oscar G. Joseph, 32 B.T.A. 1192. The facts here are in some respects similar to Lucius Pitkin, Inc., supra, where it was held that the transaction there was a partial liquidation and not a sale. *161 See, also, Salt Lake Hardware Co., 27 B.T.A. 482, 486; Dill Manufacturing Co., 39 B.T.A. 1023; Johnson, Carvell & Murphy v. Riddell (U.S.D.C.S. Dist. of California), 173 F. Supp. 214. Consideration has been given to the cases cited by petitioner but they are distinguishable on their facts and are not controlling. Among them are Dorsey Co. v. Commissioner, 76 F. 2d 339; Spear & Co. v. Heiner, 54 F. 2d 134; and Commissioner v. Boca Ceiga Development Co., 66 F. 2d 1004. Many cases have dealt with the same type of question as is presented here. It is not feasible to comment on all of them. We are convinced that the facts here bring this case within sections 115(c) and 115(i). It is observed, further, that the petitioner was controlled by McEnery and Benson, and that they, also, controlled the partnership to which the distributees of the assets transferred the hardware business. The net effect of the plan was to separate the hardware operations from a petitioner's other business, and that effect is indicative of a partial liquidation. In view of the conclusion reached, it is unnecessary to consider other *162 arguments and related questions which have been presented by both parties. The respondent correctly determined that petitioner did not realize a loss upon the distribution of the assets involved. The final question is whether the expenditures for accounting, escrow, and legal services incident to the whole transaction, of which $450 was paid in 1951, and $1,650.50 was paid in 1952, are deductible under section 23(a)(1)(A) as ordinary and necessary business expenses. Petitioner has the burden of proving that they were. No proof whatsoever about the expenses was presented. The petitioner appears to have taken the view that determination of this issue depends upon the conclusion reached under the main issue, i.e., that disallowance of the claimed deductions follows if the main issue is decided in respondent's favor. Petitioner admits that all of the expenses were related to carrying out the plan of distributing the hardware assets to the stockholders. Respondent contends that none of the expenses constituted ordinary and necessary expenses of carrying on petitioner's business, but rather were nondeductible capital expenditures. In Mills Estate, Inc. v. Commissioner, 206 F. 2d 244, *163 reversing in part 17 T.C. 910, the Court of Appeals took the position that what took place in that case was a change in corporate structure for the benefit of future operations, and that the costs of that type of corporate change are not deductible as ordinary and necessary expenses of carrying on a trade or business. In Standard Linen Service, Inc., 33 T.C. 1,; we held that the taxpayer was not entitled to deduct as ordinary and necessary expenses any portion of certain miscellaneous expenditures in connection with the transfer of its assets in partial liquidation, the amendment of its corporate charter, and the redemption and cancellation of its stock, on the ground that the taxpayer had failed to show that no part of these expenditures represented the cost of a capital item. We see no essential difference between the instant case and Standard Linen Service, supra. Here, the petitioner has failed to show that no part of the expenditures constituted capital expense, or that any part constituted ordinary and necessary expenses of its business. The respondent's disallowance of the claimed deductions is sustained. Decision will be entered that *164 there is an income tax deficiency for 1951 in the amount determined in the statutory notice of deficiency. With respect to 1952 and 1953, the respondent now concedes that he erred in disallowing a deduction of $100 in each year. Since allowance of those deductions may slightly reduce the deficiencies for those years. Decision will be entered under Rule 50. Footnotes
1. Sec. 122(a). Definition of Net Operating Loss. - As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d).↩
2. Sec. 115(i). Definition of Partial Liquidation. - As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.↩